1  JONATHAN E. NUECHTERLEIN
2  GENERAL COUNSEL

3  MATTHEW H. WERNZ
   mwernz@ftc.gov
4  Federal Trade Commission
5  55 West Monroe Street, Suite 1825
   Chicago, Illinois 60603
6  Tel: (312) 960-5634; Fax: (312) 960-5600

7
8  RAYMOND E. MCKOWN (Cal. Bar No. 150975)
   rmckown@ftc.gov
9  Federal Trade Commission
10 10877 Wilshire Boulevard, Suite 700
   Los Angeles, California 90024
11 Tel: (310) 824-4343; Fax: (310) 824-4380

12
13 Attorneys for Plaintiff
   FEDERAL TRADE COMMISSION
14
15            UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
16

17 FEDERAL TRADE COMMISSION,,          Case No. CV 15-03107 PA (AJWx)

18      Plaintiff,

19      v.                            Memorandum in Support of Plaintiff's
                                      *Ex Parte* Application for Temporary
20                                    Restraining Order with Asset Freeze,
   SALE SLASH, LLC, a California      Appointment of a Receiver, Other
21 limited liability company,         Equitable Relief, and Order to Show
                                      Cause Why a Preliminary Injunction
22                                    Should Not Issue
   PURISTS CHOICE LLC, a California
23 limited liability company,

24
   ARTUR BABAYAN, individually and
25 as an owner and manager of SALE
26 SLASH, LLC and PURISTS CHOICE
   LLC, and
27
28



                         i

VAHE HAROUTOUNIAN,
individually and doing business as
PRISMA PROFITS,

    Defendants.

# TABLE OF CONTENTS

I.  Introduction ......................................................................................... 1

II.  Defendants' Illegal Business Practices ................................................. 4

    A.    Defendants' Illegal Spam Email Campaign ......................................... 5

    B.    Defendants' Deceptive Fake News Websites ....................................... 7

        1.    False and Unsubstantiated Weight-Loss Claims ......................... 9

        2.    Phony Endorsements ................................................................. 10

III.  Defendants ........................................................................................ 11

IV.  Argument ........................................................................................... 14

    A.    This Court Has the Authority to Grant the Requested Relief ............. 14

    B.    The FTC's Evidence Supports Temporary Injunctive Relief ............. 15

        1.    Defendants Are Violating the FTC Act and the CAN-SPAM Act ................................................................... 15

            a.    Defendants' false weight-loss claims and phony endorsements violate the FTC Act ................................... 15

            b.    Defendants' spam campaign violates the CAN-SPAM Act. ......................................................... 18

                i.    Defendants are liable for spam they procure ....... 18

                ii.    Defendants' spam violates the CAN-SPAM Act in several ways ........................................... 20

        2.    The Equities Tip Decidedly in the FTC's Favor ...................... 20

        3.    Artur Babayan and Vahe Haroutounian are Individually Liable ................................................................... 21

C.   The Temporary Restraining Order Should Include an Asset
     Freeze, Temporary Receivership, and Other Ancillary Relief........... 22

D.   The Temporary Restraining Order Should Be Issued *Ex Parte*......... 24

V.   Conclusion...................................................................................... 25

# TABLE OF AUTHORITIES

## REPORTED CASES

*Delaware Watch Co. v. FTC,*
  332 F.2d 745 (2d Cir. 1964)..................................................................... 12

*FTC v. Affordable Media, LLC,*
  179 F.3d 1228 (9th Cir. 1999).................................................... 14, 15, 20, 21

*FTC v. Am. Nat'l Cellular, Inc.,*
  810 F.2d 1511 (9th Cir. 1987)...............................................................22-23

*FTC v. Amy Travel Serv., Inc.,*
  875 F.2d 564 (7th Cir. 1989)..................................................................... 21

*FTC v. Cyberspace.com, LLC,*
  453 F.3d 1196 (9th Cir. 2006)................................................................... 16

*FTC v. Five-Star Auto Club,*
  97 F. Supp. 2d 502 (S.D.N.Y. 2000)......................................................... 16

*FTC v. H.N. Singer, Inc.,*
  668 F.2d 1107 (9th Cir. 1982).............................................................. 14, 22

*FTC v. John Beck Amazing Profits, LLC,*
  865 F. Supp. 2d 1052 (C.D. Cal. 2012) .................................................... 12

*FTC v. Kraft,*
  970 F.2d 311 (7th Cir. 1992)..................................................................... 16

*FTC v. Pantron I Corp.,*
  33 F.3d 1088 (9th Cir. 1994)................................................................ 14, 16

*FTC v. Publ'g Clearing House, Inc.,*
  104 F.3d 1168 (9th Cir. 1997)................................................................... 14

*FTC v. Stefanchik,*
  559 F.3d 924 (9th Cir. 2009).............................................................. 17, 21

*FTC v. Think Achievement Corp.,*
    144 F. Supp. 2d 993 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002) . 12

*FTC v. U.S. Oil & Gas Corp.,*
    748 F.2d 1431 (11th Cir. 1984)................................................................ 24

*FTC v. Warner Commc'ns, Inc.,*
    742 F.2d 1156 (9th Cir. 1984)................................................................ 15

*FTC v. World Travel Vacation Brokers,*
    861 F.2d 1020 (7th Cir. 1988)................................................................ 23

*FTC v. World Wide Factors, Ltd.,*
    882 F.2d 344 (9th Cir. 1989)......................................................15, 21, 22-23

*In re Cliffdale Assocs.,*
    103 F.T.C. 110 (1984) ........................................................................ 16

*In the Matter of McGaughey,*
    24 F.3d 904 (7th Cir. 1994)................................................................... 24

*Johnson v.Couturier,*
    572 F.3d 1067 (9th Cir. 2009)................................................................ 23

*Sw. Sunsites, Inc. v. FTC,*
    785 F.2d 1431 (9th Cir. 1986)................................................................ 17

*Standard Distributors, Inc. v. FTC,*
    211 F.2d 7, 13 (2nd Cir. 1954)............................................................... 17

### UNREPORTED CASES

*FTC v. Am. Mortgage Consulting Group, LLC,*
    SACV-12-01561-DOC (JPRx) (C.D. Cal. Sept. 18, 2012) ......................... 14

*FTC v. Applied Mktg. Servs., LLC,*
    CV-13-6794-CAS (CWx) (C.D. Cal. Sept. 16, 2013) .............................. 14

*FTC v. Asset & Capital Mgmt. Group, Inc.,*
    CV-13-5267-DSF (JCx) (C.D. Cal. July 24, 2013) ................................. 14

*FTC v. Atkinson,*
    No. 08-cv-5666 (N.D. Ill. Oct. 6, 2008) ........................................ 15

*FTC v. Clickbooth.com, LLC,*
    No. 12-cv-9087 (N.D. Ill. Nov. 28, 2012) ........................................ 2

*FTC v. Forensic Case Mgmt. Servs., Inc.,*
    CV-11-07484-RGK (SSx) (C.D. Cal. Sept. 13, 2011) ............... 14

*FTC v. Pac. Herbal Servs., Inc.,*
    CV05-7247-RSWL (C.D. Cal. Oct. 6, 2005)................................. 15

*FTC v. Phoenix Avatar, LLC,*
    No. 04-cv-2897, 2004 WL 1746698 (N.D. Ill. July 30, 2004) .............. 18, 19

*FTC v. Rincon Mgmt. Servs. LLC,*
    CV-11-01623-VAP (SPx) (C.D. Cal. Oct. 11, 2011) .................... 14

*FTC v. Sili Neutraceuticals*
    Case No. 07-cv-4541 (N.D. Ill. Aug. 13, 2007) ......................... 15

*FTC v. Spear Systems, Inc.,*
    No. 07-cv-5597 (N.D. Ill. Oct. 10, 2007) ................................ 15

*FTC v. Centro Natural Services, Inc.,*
    CV-06-989-JVS (RNBx) (N.D. Ill. Oct. 17, 2006)........................ 15

*United States v. Impulse Media Group, Inc.,*
    No. CV05-1285RSL, 2007 WL 1725560 (W.D. Wash. June 8, 2007) ........ 19

**STATUTES**

Federal Trade Commission Act
15 U.S.C. § 45(a) ........................................................... 15, 16, 17

15 U.S.C. § 52 ..................................................................... 16

15 U.S.C. § 53(b)................................................................... 14

15 U.S.C. § 55 ............................................................................ 16

The Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003
15 U.S.C. § 7701 ........................................................................ 18

15 U.S.C. § 7702 .................................................................. 18, 19

15 U.S.C. § 7704 ........................................................................ 20

### TREATISES

Restatement (Third) of Agency § 1.01 (2006) ......................... 17

## I.     Introduction

The Federal Trade Commission asks that this Court bring an immediate halt to a Glendale, California-based online marketing scheme that uses blatantly false weight-loss claims and phony celebrity endorsements to market bogus diet pills. The scheme also employs illegal spam emails to lure consumers to Defendants' diet-pill websites.  Over the last two years, this operation has paid over $17 million in commissions to agents to deceptively market on its behalf, and itself has taken in far more than that.

Defendants' deception typically begins with consumers receiving an email message that purports to be from a friend or family member. It is not.  The consumer is receiving the email because the friend or family member's email account was hacked, and spam emails have been sent to all the contacts of the hacked account.  The spam email includes a simple message such as "Hi! How are you? Have you seen this?"  Following the message is a hyperlink.

Clicking on that hyperlink leads the consumer to a "fake news" website, which actually is a disguised advertisement for one of Defendants' various diet pills.  The website is designed to look like an article by a consumer reporter.  At the top of the website is a large-print headline such as, "**INSIDER REPORT: Oprah and Other Celebrities Lose 4 lbs / Week of Belly Fat With This Secret That Our Readers Can Try Now!**"  What follows purports to be the account of

the consumer reporter, describing how she lost 36 pounds in 9 weeks by taking the diet pill featured on the website.  The website also includes images or logos of Oprah Winfrey or "The Doctors" television show, suggesting that those personalities have endorsed the product.  Throughout the fake news website are hyperlinks that consumers can click to visit Defendants' websites, where they can purchase the featured diet pill for $59 or more.

Virtually everything about these "news" websites is fake.  The websites do not belong to news organizations, and no reporter conducted a trial of the featured product.  The websites actually are advertisements placed by Defendants or their agents to attract consumers to Defendants' websites, where consumers can buy the featured products.  The weight-loss claims made on the fake news websites are blatantly false and physically impossible – there simply are no diet pills that cause such dramatic weight loss.  And the alleged celebrity endorsers featured on the websites have nothing to do with Defendants or their products.  Fake news websites like these are a common deceptive marketing tactic that the FTC has challenged successfully in several recent cases.[1]

The deceptive marketing of bogus weight-loss supplements is a pervasive

---

[1]    *See FTC v. Clickbooth.com, LLC*, No. 12-cv-9087 (N.D. Ill. stipulated permanent injunction entered Nov. 28, 2012); *see also* "FTC Seeks to Halt 10 Operators of Fake News Sites from Making Deceptive Claims About Acai Berry Weight Loss Products," *available at* https://www.ftc.gov/news-events/press-releases/2011/04/ftc-seeks-halt-10-operators-fake-news-sites-making-deceptive (last accessed Apr. 2, 2015).

problem, especially online.  The FTC's 2011 Consumer Fraud Survey showed that weight-loss fraud victimized more consumers in 2011 than any other fraud.[2]

Under the Federal Trade Commission Act ("FTC Act") and the Controlling the Assault of Non-Solicited Pornography and Marketing ("CAN-SPAM") Act of 2003, Defendants are responsible for the illegal marketing tactics used to sell their diet pills, including email spam, false weight-loss claims, and phony endorsements. Defendants have paid commissions of more than $17 million to agents who engaged in the massive spam email campaign and who set up the fake news websites.  At the same time, Defendants have tried to disguise their own role in this scheme by using fake names and addresses to register their diet-pill websites and by using mail drops rather than their actual business address.

To bring an immediate halt to Defendants' law violations and to preserve assets for eventual restitution to victims, the Commission asks that the Court issue an *ex parte* temporary restraining order ("TRO") without notice to defendants that includes a freeze of Defendants' assets and the appointment of a temporary receiver over the corporate defendants.  The requested relief is necessary to prevent continued injury to consumers, the destruction of evidence, and the dissipation of assets, thereby preserving the Court's ability to provide effective final relief.

---

[2]    *See* "Consumer Fraud in the United States," Federal Trade Commission, at i (Apr. 2013), *available at* https://www.ftc.gov/sites/default/files/documents/reports/consumer-fraud-united-states-2011-third-ftc-survey/130419fraudsurvey_0.pdf (last accessed Apr. 13, 2015).

## II.  Defendants' Illegal Business Practices

Defendants sell several types of bogus diet pills on their websites.  To get consumers to visit those websites and to purchase their pills, Defendants use fake news websites that are designed to look like articles by independent consumer reporters.  Some of the fake news websites are maintained by Defendants themselves, although most are created and maintained by "affiliate marketers" working on Defendants' behalf.[3]  Regardless of who creates and maintains them, however, all of these fake news websites make nearly identical false weight-loss claims and use the same phony celebrity endorsements to convince consumers to click on hyperlinks leading to Defendants' websites, where they can buy the pills.[4]

The affiliate marketers hired by Defendants lure consumers to the fake news websites in two ways.  First, some of these marketers deluge consumers with illegal spam emails containing an innocent-looking hyperlink.  Clicking on the link leads the consumer to a fake news website.  Second, other affiliate marketers drive consumers to the fake news websites by placing banner advertisements in the

---

[3]  *See generally* Declaration of Douglas M. McKenney ("McKenney Dec."), Plaintiff's Exhibit ("PX") 7, at 126-27, ¶¶ 5-7 (describing affiliate marketing); *see also id.*, at 131-33, ¶¶ 17-23, at 186-89 (Att. D), at 193-97 (Att. E) (showing fake news websites operated by Defendants); *see also id.* at 146, ¶ 56, at 146-47, ¶ 60, at 148, ¶ 65, & at 150-51, ¶ 71(a) (showing Defendants' fake news websites were registered from Defendants' place of business).

[4]  Defendants have sold a variety of types of pills through these illegal means, including the products Pure White Kidney Bean Extract, Pure Garcinia Cambogia Extract, Pure Forskolin Extract, and Pure Caralluma Fimbriata Extract. *See generally id.* at 127-33.

margins of high-volume, third-party websites (*e.g.,* an actual news website) that, when clicked, also lead to the fake news websites.  When consumers click through and purchase Defendants' diet pills, the responsible affiliate marketer earns a commission.[5]

Defendants are responsible for the deceptive marketing of the affiliates they have hired.  Defendants use an online portal to track and monitor every click and sale generated by affiliate marketers working for them.[6]  Defendants even track each fake news website that draws consumers to their diet-pill websites.[7]

## A.    Defendants' Illegal Spam Email Campaign

Defendants' massive spam email campaign begins when their spammers obtain access to the contact list of a hacked email account.  The spammers then send spam emails to each of those contacts, with the email appearing to come from the hacked account.  The email's subject line also shows the name of the individual whose account was hacked.  For example, if the account johnsmith@yahoo.com was hacked, a spam email appearing to come from John Smith would be sent to his contact list with the subject line "from John Smith."[8]  The recipient of that email

---

[5]     *See generally* McKenney Dec., PX 7, at 126-27, ¶¶ 5-7.
[6]     *Id.* at 142, ¶ 48 (explaining detailed data included in the tracking portal).
[7]     *Id.* at 142-44, ¶ 49 (showing fake news websites leading consumers to purchase several of Defendants' products).
[8]     *See* Declaration of H. Jacqueline Brehmer ("Brehmer Dec."), PX 3, at 21, ¶ 5 (describing spam attacks on compromised Yahoo email accounts).  In some instances, Defendants' spam lists the name of the person whose account was

would be one of John Smith's contacts and so would know him.

The spam email message itself is usually quite short:

Hi! How are you? Have you seen this [link] It was shown on Oprah's show![9]

Hi! CNN says this is one of the best [link][10]

These spam messages appear to be casual, personal emails that just suggest that the recipients look at an interesting website. Despite their innocent appearance, however, the emails actually are advertisements designed to deceive consumers into clicking on a link that will take them to a fake news website promoting Defendants' diet pills.[11]

Defendants' spam email campaign has been massive. Defendants' spammers have sent more than 20 million distinct website links in their spam emails,[12] luring 7 million consumers and generating more than 140,000 sales.[13]

---

compromised as the sender, but the email actually originates from a new account set up by spammers. For example, several of Defendants' spam emails appeared to be from a consumer named Michael Palmer, and were sent to his contact list. These emails were not sent by Palmer but rather were sent from unrelated accounts like "metagel@metagel.com.br." Declaration of Michael Palmer ("Palmer Dec."), PX 2, at 13-14, ¶¶ 4-5 & at 17, Att. A; *see also* Declaration of Richard Holland ("Holland Dec."), PX 1, at 4, ¶¶ 2-3, at 6, ¶ 10 (describing email that listed consumer's nephew as sender but in fact was spam from unrelated address).

[9]   McKenney Dec., PX 7, at 128-29, ¶ 11, & at 168, Att. B.
[10]   Palmer Dec., PX 2, at 14, ¶ 6, & at 18, Att. B.
[11]   Holland Dec., PX 1, at 4-6, ¶¶ 3-8 (consumer clicked on link in email that appeared to come from nephew and was taken to advertisement for Defendants' products); McKenney Dec., PX 7, at 128-32, ¶¶ 11-19 (describing three spam emails leading to advertisements for Defendants' products).
[12]   Brehmer Dec., PX 3, at 21-22, ¶¶ 5-7 (describing spam investigation).

The spam has compromised consumers' email accounts[14] and has tricked consumers into buying Defendants' bogus pills.[15]  Defendants have paid these spammers more than $10 million in commissions.[16]  As explained more fully below, Defendants are liable for these spam emails under the CAN-SPAM Act because they have "procured" the transmission of the spam.

### B.    Defendants' Deceptive Fake News Websites

All of the fake news websites used to market Defendants' diet pills make similar deceptive claims, regardless of whether the site is maintained by the Defendants or one of their affiliate marketers.  The fake news websites begin with an enticing headline, like one of those below, promising that the advertised product causes dramatic weight-loss:

**SPECIAL REPORT: Lose 23 lbs of Belly Fat in 1 Month With This Diet Cleanse That Celebrities Use. Exclusive Offer for Readers.** [17]

Or:

---

[13]    McKenney Dec., PX 7, at 142-43, ¶ 49(b)-(c).
[14]    *See* Palmer Dec., PX 2; Brehmer Dec., PX 3, at 21-24, ¶¶ 5-13 (describing spam from hacked Yahoo accounts linked to Defendants' websites).
[15]    Holland Dec., PX 1, at 4-6, ¶¶ 3-10 (consumer purchased Defendants' product after receiving spam that appeared to be from his nephew, a pharmacist).
[16]    McKenney Dec., PX 7, at 142-43, ¶ 49(d) (showing Defendants paid more than $10.2 million to email marketer "39"); *id.* at 129-30, ¶ 13, at 131, ¶ 16, at 134, ¶ 26, & at 138-39, ¶¶ 37-38 (showing that marketer "39" sent subject spam email).
[17]    *Id.* at 128, ¶ 9 & at 157, Att. A.  Defendants paid this affiliate more than $7 million. *Id.* at 144, ¶ 50; *id.* at 148, ¶ 64.

**INSIDER REPORT**

*Oprah and Other Celebrities Lose 4 lbs / Week of Belly Fat With This Secret That Our Readers Can Try Now!* [18]

These headlines are followed by what purports to be the first-person account of a supposed consumer reporter who claims to have tried one of Defendants' weight-loss products. This reporter professes that she was "a little skeptical" of Defendants' product but "decided to go out and put the product to the test myself." In a "My Results" section, the reporter describes week-by-week weight loss: 8 pounds in the first week; 5 more pounds over the next two weeks; 3 additional pounds in week four; and, by the end, "I lost 36 lbs body fat in 9 Weeks, No Special Diet, No Intense Exercise." Surrounding this narrative are consumer testimonials and endorsements by celebrities like Oprah Winfrey, who also supposedly experienced dramatic weight-loss by taking Defendants' pills.[19]

The deceptive content of the various fake news websites remains the same regardless of which of Defendants' many diet pills is being advertised. Defendants have promoted the weight-loss supplements forskolin, white kidney bean extract, and caralluma fimbriata through essentially identical fake news websites. Even the

---

[18]   *See, e.g.,* McKenney Dec., PX 7, at 128-29, ¶¶ 11-12 & at 168, Att. B.
[19]   *See, e.g., id.,* at 129, ¶ 12 & at 169-72, Att. B.

typos – "What better way to find out the truth that [sic] to conduct my own study?" – remain unchanged from one fake news website to the next.[20]

The fake news websites contain links that lead consumers to Defendants' websites.  There, Defendants perpetuate the fake news websites' bogus claims with statements like, "Enhance Your Diet and Lose Weight Fast!," "ARE YOU *ready to LOSE WEIGHT?*," or "Rapid Belly Melt without *diet* or *exercise.*"[21]  On these websites, consumers can purchase Defendants' products for $59 or more.[22]

### 1.   False and Unsubstantiated Weight-Loss Claims

The weight-loss claims on Defendants' fake news websites are false and unsubstantiated—it is simply impossible to lose 36 pounds in 9 weeks merely by taking a diet pill.  According to weight-loss expert Dr. David Levitsky, a professor at Cornell University, none of Defendants' products could cause the weight loss claimed on the fake news websites—36 pounds in 9 weeks, 23 pounds in 1 month, or 17 pounds in 4 weeks.[23]  Although Defendants make identical weight-loss claims for a variety of different pills,[24]  Dr. Levitsky explains that there are *no* weight-loss supplements that cause such dramatic weight loss.  Indeed, he concludes that the rapid and substantial weight loss claimed by Defendants is

---

[20]    *Compare id.* at 170, Att. B *with id.* at 179, Att. C.
[21]    *Id.*, at 183, Att. C; *id.* at 190, Att. D; *id.* at 173, Att. B.
[22]    McKenney Dec., PX 7, at 134-35, ¶¶ 26-28.
[23]    Declaration of David A. Levitsky, Ph.D. ("Levitsky Dec."), PX 6, at 72-79, ¶¶ 14-17, 19-20, 22-23, 26-27, 31-32.
[24]    *Compare* McKenney Dec., PX 7, at 169-72, Att. B *with id.* at 178-82, Att. C.

"beyond the physiological range of possible weight loss caused by ingestion of weight-loss supplements."[25]  As noted by Dr. Levitsky, moreover, the available scientific literature, including studies that Defendants post to their websites, does not support Defendants' outlandish weight-loss claims.[26]

### 2.    Phony Endorsements

Defendants' fake news websites also promote their products through phony endorsements.  The websites typically feature the logo of the television show "The Doctors," along with a photograph of the cast of the show, suggesting that the Defendants' products have been endorsed by "The Doctors":[27]



---

[25]    Levitsky Dec., PX 6, at 73, ¶ 17.

[26]    *Id.* at 74-79, ¶¶ 19-20, 22-23, 26-27, 31-32.  For example, Defendants sell forskolin as a purported weight-loss supplement even though a study of forskolin that Defendants posted to their website expressly found "no significant changes were observed in body weight, fat content, or lean body mass."  *See* McKenney Dec., PX 7, at 155, ¶ 81 & at 253-54, Att. K.

[27]    *Id.*, at 129, ¶ 12, & at 169-72, Att. B.

These same fake news websites show a photograph of Oprah Winfrey above the following statement:

> *'I lost 17lbs in 4 weeks with No Special Diet, No Intense Exercise!'*
> *The benefits of the Caralluma Fimbriata Extract beat all of our initial*
> *skepticism.  We found the diet not only helped with weight loss and*
> *getting rid of belly fat, but it seemed to boost energy levels, and also*
> *helped Oprah sleep better and to wake-up more rested.*
> *~ Oprah Winfrey*[28]

The identical endorsements appear on fake news websites for the different types of diet pills promoted by Defendants.[29]

These endorsements are phony.  Sworn statements from Oprah and The Doctors confirm that they have not used or endorsed Defendants' products.[30]

## III.    Defendants

Defendant **Artur Babayan** controls Defendants' deceptive diet-pill enterprise.  He is the owner[31] and president[32] of defendant **Sale Slash, LLC** and

---

[28]    *Id.* at 169, Att. B.
[29]    *Compare id.* at 169, Att. B, *with id.* at 178, Att. C *and id.* at 186, Att. D.
[30]    *See* Declaration of Bernard Gugar ("Gugar Dec."), PX 4, at 36-39, ¶¶ 8-11, 14-17, 20-23 (stating that Oprah's licensing company did not authorize the use of her name or image for the marketing of Defendants' products and that Oprah has not taken or endorsed Defendants' products); *see also* Declaration of Kristen Fischer ("Fischer Dec."), PX 5, at 52-53, ¶¶ 8-9, 12-13, 16-17 (stating that Defendants' products have never been endorsed by "The Doctors" or featured on their show and that their images and names and the logo and name of the show have never been licensed for the marketing of Defendants' products).
[31]    McKenney Dec., PX 7, at 149-50, ¶ 68(e).
[32]    *Id.* at 151, ¶ 71(b).

the owner[33] of defendant **Purists Choice LLC**.  Babayan controls the finances of

Defendants' scheme, including the processing of victimized consumers' credit card

payments, payments to the affiliate marketers,[34] and payments for the tracking

services used to monitor those affiliates.[35]  Through Sale Slash, Babayan paid

illegal spammers and other marketers more than $17 million in commissions,[36]

collected consumers' payments,[37] and paid to ship Defendants' pills.[38]  Babayan

used Purists Choice to process consumer payments[39] while also branding

Defendants' products with the "Purists Choice" logo.[40]  These two companies

operate as a common enterprise and so are jointly and severally liable.[41]

---

[33] *Id.* at 150, ¶ 69(a) & at 151, ¶ 72(a).
[34] *Id.* at 149-51, ¶¶ 68, 69, 71(b), 72(a).
[35] *Id.* at 139-40, ¶ 42.
[36] McKenney Dec., PX 7, at 142-44, ¶¶ 49-50, & at 149, ¶ 68.
[37] *Id.* at 150-51, ¶ 71.
[38] *Id.* at 152, ¶ 73.
[39] *Id.* at 151, ¶ 72(a); *see also id.* at 136, ¶ 31 (Defendants' charge for Pure White Kidney Bean Extract shows as "WWW.PURISTSCHOICE.COM").
[40] McKenney Dec., PX 7, at 129-30, ¶ 13 & at 173, Att. B (Defendants' website selling "Purists Choice" product); *see also id.* at 135-36, ¶¶ 28-29 (same).
[41] "Where one or more corporate entities operate as a common enterprise, each may be held liable for the deceptive acts and practices of the others." *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002).  *See also FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1082 (C.D. Cal. 2013) (quoting *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964) (when individuals transact business through a "maze of interrelated companies," the whole enterprise is liable as a joint enterprise)).
Sale Slash and Purists Choice operate a common enterprise by having a common principal, sharing affiliate marketers, and commingling assets by paying those marketers from Sale Slash's checking account.  *Id.* at 149-50, ¶ 68.  The companies have also signed a Cross-Corporate Guaranty.  *Id.* at 151-52, ¶ 72(b).

Defendant Haroutounian manages Defendants' marketing efforts.  From Defendants' warehouse in Glendale, California, where Defendants store and ship their diet pills,[42] Haroutounian tracks each click and sale in Defendants' multimillion-dollar deceptive marketing and illegal spam operation.[43]

Defendants have attempted to conceal their identities from consumers and law enforcement.  They register their fake news websites and product websites using falsified information, such as "Dnem Moblit, 354 Lavas Blvd, Levittown NY 11756."[44]  Defendants Sale Slash and Purists Choice list their official corporate addresses as mail drops, rather than their actual business premises.[45]  Nevertheless, extensive records link Defendants to their products, their websites, and their Glendale warehouse.[46]

---

[42]    McKenney Dec., PX 7, at 140-41, ¶ 44, at 148, ¶ 65, & at 150-51, ¶ 71.

[43]    *Id.*, at 139-41, ¶¶ 41, 43, 44, 46, 47.

[44]    *Id.*, at 145-46, ¶¶ 51, 56-59.

[45]    *Id.*, at 152-53, ¶¶ 74-75, 77-78 (showing how corporate Defendants' registered addresses are mailboxes); *id.* at 133, ¶ 23, at 136, ¶ 30, & at 153, ¶ 76 (showing Defendants' use of mailbox address on Moorpark Street in Studio City, California for sale of Pure Forskolin Extract and Pure White Kidney Bean Extract).

[46]    *See, e.g.*, McKenney Dec., PX 7, at 133-37, ¶¶ 24-34 (describing purchase of Defendants' products).  Defendants registered their websites from their Glendale warehouse.  *Id.* at 146-47, ¶¶ 59-60 (showing log-in to domain registration records from particular Internet Protocol ("IP") address); *id.* at 140-41, ¶ 44(b) (showing log-in to tracking platform from same IP address); *id.* at 148, ¶ 65 (showing IP address assigned to 547 Arden Avenue, Glendale, California); *id.* at 150-51, ¶ 71 (showing that 547 Arden Avenue belongs to Sale Slash).

## IV.   Argument

The Court should issue an *ex parte* TRO to prevent continued harm, dissipation of assets, and destruction of evidence, and to preserve the Court's ability to provide effective, final relief to injured consumers.

### A.   This Court Has the Authority to Grant the Requested Relief

The FTC Act provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  15 U.S.C. § 53(b).  Once the Commission invokes a federal court's equitable powers, the full breadth of the court's authority is available, including the power to grant such ancillary final relief as restitution.  *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994); *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982). Ancillary relief may include an asset freeze for eventual restitution to victims. *H.N. Singer*, 668 F.3d at 1112-13.  Courts in this district have granted *ex parte* TROs like that requested here, and the Ninth Circuit has affirmed such relief.[47]

---

[47]      *See, e.g., FTC v. Applied Mktg. Servs., LLC*, CV-13-6794-CAS (CWx) (Sept. 16, 2013) (*ex parte* TRO with asset freeze, appointment of a receiver, immediate access to business premises); *FTC v. Asset & Capital Mgmt. Group, Inc.*, CV-13-5267-DSF (JCx) (July 24, 2013) (same); *FTC v. Am. Mortgage Consulting Group, LLC*, SACV-12-01561-DOC (JPRx) (Sept. 18, 2012) (same); *FTC v. Rincon Mgmt. Servs. LLC*, CV-11-01623-VAP (SPx) (Oct. 11, 2011) (same); *FTC v. Forensic Case Mgmt. Servs., Inc.*, CV-11-07484-RGK (SSx) (Sept. 13, 2011) (same).  *See also, e.g., FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1232-33, 1238 (9th Cir. 1999) (*ex parte* TRO, preliminary injunction, asset freeze); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) (*ex parte* TRO, preliminary injunction).

Federal courts in this district and elsewhere also have routinely granted *ex parte* TROs with asset freezes in dietary supplement and spam cases like this one.[48]

## B.   The FTC's Evidence Supports Temporary Injunctive Relief

To grant temporary injunctive relief in an FTC Act case, the district court must (1) determine the likelihood that the Commission ultimately will succeed on the merits, and (2) balance the equities. *See FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999) (citing *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984)). Unlike private litigants, the FTC need not prove irreparable harm. *See id.*; *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989). The FTC easily satisfies the TRO elements here.

### 1.   Defendants Are Violating the FTC Act and the CAN-SPAM Act

The FTC is likely to succeed in showing that Defendants are violating Sections 5(a) and 12 of the FTC Act and Section 5(a) of the CAN-SPAM Act.

#### a.   Defendants' false weight-loss claims and phony endorsements violate the FTC Act.

An act or practice is deceptive in violation of Section 5(a) of the FTC Act, 15 U.S.C. §45(a), if it is likely to mislead consumers, acting reasonably under the

---

[48]   *FTC v. Atkinson*, No. 08-cv-5666 (N.D. Ill. Oct. 6, 2008) (temporarily enjoining CAN-SPAM violations and false weight-loss claims *ex parte*); *FTC v. Spear Systems, Inc.*, No. 07-cv-5597 (N.D. Ill. Oct. 10, 2007) (same); *FTC v. Sili Neutraceuticals*, No. 07-cv-4541 (N.D. Ill. Aug. 13, 2007) (same); *FTC v. Pac. Herbal Servs., Inc.*, CV05-7247-RSWL (C.D. Cal. Oct. 6, 2005) (same); *FTC v. Centro Natural Services, Inc.*, CV-06-989-JVS (RNBx) (N.D. Ill. Oct. 17, 2006) (temporarily enjoining false weight-loss claims *ex parte*).

circumstances, in a material respect.  *See FTC v. Cyberspace.com LLC*, 453 F.3d

1196, 1199 (9th Cir. 2006).  A representation or omission is material if it

"'involves information that is important to consumers and, hence, likely to affect

their choice of, or conduct regarding, a product.'"  *Id.* at 1201 (quoting deception

standard set forth in *In re Cliffdale Assocs.*, 103 F.T.C. 110, 164-65 (1984))).

Express claims are presumed to be material, *Pantron I*, 33 F.3d at 1095-96, as are

"claims that significantly involve health, safety, or other issues with which

reasonable consumers would be concerned," *FTC v. Kraft*, 970 F.2d 311, 322-23

(7th Cir. 1992) (citation omitted).  Consumer reliance upon express claims is

presumptively reasonable.  *FTC v. Five-Star Audio Club, Inc.*, 97 F. Supp. 2d 502,

528 (S.D.N.Y. 2000) (citation omitted).

Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of

any false advertisement which is likely to induce the purchase of food, drugs,

devices, services, or cosmetics.  Defendants' weight-loss products are either a

"food" or a "drug" for purposes of Section 12.  *See* 15 U.S.C. §§ 55(b), (c).

Here, Defendants and their affiliate marketers have made bogus weight-loss

claims on their fake news websites that violate Sections 5(a) and 12 of the FTC

Act.  Claims that taking Defendants' pills causes dramatic weight-loss, such as 36

pounds in 9 weeks, are both material and false.  As Professor Levitsky has

testified, such dramatic weight-loss is impossible generally, and is particularly

impossible by ingesting Defendants' products.[49]

Defendants' use of bogus celebrity endorsements to market their pills also

violates Section 5(a) of the FTC Act.   They claim that celebrities like Oprah

Winfrey and "The Doctors" television show have endorsed (and that Oprah has

successfully used) Defendants' diet pills, when those personalities have no

connection to Defendants' products.[50]

Defendants are liable under the FTC Act for the false claims made by those

marketing on their behalf.  The email spammers and other affiliate marketers who

operate the fake news websites are Defendants' agents.  A principal is liable for an

agent's FTC Act violations. *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 930 (9th

Cir. 2009) (citing *Sw. Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1438 (9th Cir. 1986));

*Standard Distributors, Inc. v. FTC*, 211 F.2d 7, 13 (2nd Cir. 1954) (defendant

liable despite unsuccessful efforts to prevent agents' misrepresentations).  Agency

exists when the principal agrees that the agent "act on the principal's behalf and

subject to the principal's control, and the agent . . . consents so to act."

Restatement (Third) of Agency § 1.01 (2006).  The right to control the agent is

sufficient, even if the principal fails to exercise that right. *Id.* § 1.01 cmt. c.

---

[49]   Levitsky Dec., PX 6, at 72-79, ¶¶ 15-17, 19-20, 22-23, 26-27, 31-32.
[50]   Gugar Dec, PX 4, at 36-39, ¶¶ ¶ 8-11, 14-17, 20-23; Fischer Dec., PX 5, at 52-53, ¶¶ 8-9, 12-13, 16-17.

Here, the spammers and other affiliate marketers are Defendants' agents. Defendants delegated their marketing to affiliates, paying them to draw consumers to Defendants' websites. Defendants have tracked these affiliates' marketing activities, paying them more than $17 million over the course of two-plus years.

**b.      Defendants' spam campaign violates the CAN-SPAM Act.**

The evidence also shows that Defendants' multimillion-dollar spamming campaign clearly violates the CAN-SPAM Act, 15 U.S.C. § 7701 *et seq.*

**i.      Defendants are liable for spam they procure.**

Defendants have violated the CAN-SPAM Act by initiating blatantly illegal commercial email messages. An email is "initiated" by those who "originate or transmit" the message and also by those who "procure" its transmission. 15 U.S.C. § 7702(9). To "procure" means to "intentionally pay or provide other consideration to, or induce, another person to initiate" a message on one's behalf. *Id.* § 7702(12); *see also FTC v. Phoenix Avatar, LLC*, No. 04-cv-2897, 2004 WL 1746698, at *13 (N.D. Ill. July 30, 2004) ("Liability [under the CAN-SPAM Act] . . . also extends to those who 'procure the origination' of offending spam.").

Here, Defendants pay for—and therefore "initiate"—email messages that appear to come from recipients' family members, friends, and other contacts. These spam messages lead consumers to fake news websites maintained by the spammers, which in turn link to Defendants' own websites. Defendants have paid

these spammers more than $10 million in commissions for consumer traffic generated by these messages.[51]  *See Phoenix Avatar*, 2004 WL 1746698, at *13 (finding it "quite likely" that defendants "initiated the transmission of the spam advertising the Web sites" where defendants sold their diet patches).

Although actual knowledge of the illegal conduct is not required for CAN-SPAM liability, it is clear that Defendants know of their spammers' practices.[52] They know their spammers are sending emails to attract consumers and have been alerted by complaining consumers that deceptive spam is being used to market their products.[53]  During this spam campaign, Defendants have attempted to disguise their involvement by removing their names and identifying information from the registration of their websites.[54]

---

[51]    McKenney Dec., PX 7, at 142-43, ¶ 49(d).
[52]    Even if intent to pay for the sending of email were required to establish CAN-SPAM Act liability, *see United States v. Impulse Media Group, Inc.*, No. CV05-1285RSL, 2007 WL 1725560 (W.D. Wash. June 8, 2007), Defendants clearly intend to pay for email, as they explicitly classify their spammers as "email" marketers, McKenney Dec., PX 7, at 142-43, ¶ 49(a).
    Similarly, with respect to misleading subject headings, an initiator is liable when it has "actual knowledge, or knowledge fairly implied on the basis of objective circumstances" that the subject headings are misleading.  *See* 15 U.S.C. § 7704(a)(2).  Defendants know of their spammers' illegal conduct thanks to consumer complaints.  Holland Dec., PX 1, at 7, ¶ 14.  Moreover, their payment of $10 million to the spammers and Defendants' falsification of their website registration records to avoid detection are "objective circumstances" that fairly imply knowledge of the misleading spam.
[53]    McKenney Dec., PX 7, at 142-43, ¶ 49; Holland Dec., PX 1, at 7, ¶ 14.
[54]    McKenney Dec., PX 7, at 145-47, ¶¶ 51-60.

ii.     **Defendants' spam violates the CAN-SPAM Act in several ways.**

The CAN-SPAM Act prohibits the initiation of messages that contain false header information (such as the sender's identity) or misleading subject headings. *See* 15 U.S.C. § 7704(a)(l)-(2).  The law also requires that commercial emails both notify recipients of their ability to opt out of receiving spam from the sender and provide a link or other mechanism to opt out.  *Id.* § 7704(a)(5)(A)(ii) & (a)(3).  The CAN-SPAM Act further requires that messages list the "sender's" postal address.[55] 15 U.S.C. § 7704(a)(5)(A)(iii).

Defendants' spam flagrantly violates all of these requirements.  The spam falsely appears to come from a friend, family member, or other contact, thereby relaying false header information.  The subject headings, which indicate that the spam is "from" the same purported sender, likewise are false.  Defendants' spam does not include a notice of the right to opt out of receiving spam or a link by which to do so.  Finally, Defendants' spam does not include their postal address.

**2.     The Equities Tip Decidedly in the FTC's Favor**

The public equities in this case warrant preliminary and ancillary injunctive relief.  In weighing the equities, the Ninth Circuit has held that the public interest should receive far greater weight than private interests.  *See Affordable Media*, 179

---

[55]     The "sender" of an email is a person who "initiates" a message promoting that person's product, service, or website.  *Id.* § 7702(16).  Here, Defendants initiate spam promoting their products and so are "senders" of that spam.

F.3d at 1236; *World Wide Factors*, 882 F.2d at 347.  The public equities in this case are compelling: the public has a strong interest in halting Defendants' illegal spam campaign and false weight-loss claims and in preserving assets for restitution.  By contrast, Defendants have no legitimate interest in continuing to mislead consumers and will not be burdened by complying with the law.  *See World Wide Factors*, 882 F.2d at 347 ("[T]here is no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representations or preserve their assets from dissipation or concealment.").

### 3.    Artur Babayan and Vahe Haroutounian are Individually Liable

Defendants Artur Babayan and Vahe Haroutounian are individually liable. An individual defendant is liable for corporate practices where he (1) participated directly in, or had some authority to control, a corporation's deceptive practices and (2) had knowledge of the deceptive practices, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth.  *Stefanchik*, 559 F.3d at 931. Authority to control can arise from serving as a corporate officer, particularly of a small, closely-held corporation.  *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 573 (7th Cir. 1989).  The FTC does not need to show intent to defraud.  *Affordable Media*, 179 F.3d at 1234.

Defendant Babayan is the sole owner and officer of defendants Sale Slash, LLC and Purists Choice LLC.  He controls every aspect of Defendants' operation, including their marketing activities, their collection of consumers' payments, and their payment of affiliate marketers.  He has the authority to control the scheme and knew of or was recklessly indifferent to the deceptive and illegal practices.

Defendant Haroutounian directly participates in Defendants' deceptive affiliate marketing practices and illegal spamming.  He maintained the tracking accounts used to monitor Defendants' spammers and other deceptive affiliate marketers in real time, and also maintained Defendants' diet-pill websites.

### C.   The Temporary Restraining Order Should Include an Asset Freeze, Temporary Receivership, and Other Ancillary Relief

The Court should issue a TRO that prohibits future illegal conduct and preserves assets and documents so that the Court can grant effective final relief in this case.[56]  Part of the relief sought by the FTC is restitution for the victims of Defendants' deceptive practices.  To preserve the possibility of such relief, the FTC seeks a freeze of Defendants' assets and an immediate accounting to prevent concealment or dissipation of assets.  Such an order is well within the Court's authority. *H.N. Singer*, 668 F.2d at 1113 (FTC Act provides a basis for freezing assets to ensure court can accomplish "complete justice"); *World Wide Factors*,

---

[56]   A proposed TRO has been filed concurrently with the FTC's TRO application.

882 F.2d at 347 (since FTC showed probability of success on the merits, district court did not abuse discretion in granting injunction to freeze assets); *FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1514 (9th Cir. 1987) (FTC's power to petition for injunctive relief and asset freeze "well established").

Here, an asset freeze is appropriate given the severity of Defendants' law violations, the amount of consumer injury, and the fact that Defendants already have transferred millions of dollars in proceeds from their scheme off-shore. Defendants have paid for at least $17 million in deceptive and illegal marketing. Their bogus weight-loss claims and phony endorsements are especially egregious because they rely on highly illegal spam involving hacked email accounts to lure consumers to their deceptive claims. A freeze of Defendants' assets is necessary to preserve the status quo and ensure that funds do not disappear during the course of this action. *See Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009) (upholding asset freeze where plaintiffs established they were "likely to succeed in proving that [Defendant] impermissibly awarded himself tens of millions of dollars"). The freeze should extend to individual defendants Babayan and Haroutounian as well because the Commission is likely to succeed in showing that they are liable for restitution. *See FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d. 1020, 1031 (7th Cir. 1988).

The appointment of a temporary receiver over the corporate defendants

would prevent the destruction of documents and the dissipation of assets while the case is pending.  Such an appointment is particularly appropriate in light of Defendants' pervasive fraud, which presents the likelihood of continued misconduct.  *See In the Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994) (appointment of receiver is "an especially appropriate remedy in cases involving fraud and the possible dissipation of assets"); *see also FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984).  If Defendants are allowed to remain in control of their business, it is likely that evidence will be destroyed and the fruits of their fraud will be dissipated.  A temporary receiver would eliminate those risks with a minimal disruption of any legitimate business activity.  The receiver also would be helpful in assessing the extent of Defendants' widespread fraudulent affiliate marketing, tracing the proceeds of that fraud, preparing an accounting, and making an independent report of Defendants' activities to the Court.

### D.   The Temporary Restraining Order Should Be Issued *Ex Parte*

The requested TRO should be issued *ex parte* to prevent Defendants from dissipating their assets or destroying evidence.  A TRO should be issued *ex parte* when immediate and irreparable injury, loss, or damage will occur before the defendants can be heard in opposition.  *See* Fed. R. Civ. P. 65(b).  Here, as in similar FTC actions in this district where courts have granted an *ex parte* TRO (*see supra* n. 47) there is a serious risk that assets and evidence stemming from the

illegal activity will disappear if Defendants receive prior notice.[57]  Defendants have taken steps to conceal their identity by registering their diet-pill websites using falsified information and registering their corporate entities using mail drops, rather than actual business addresses.  They likewise have transferred millions of dollars off-shore during the course of their blatantly illegal spam campaign.[58]

## V.    Conclusion

For the above reasons, the FTC respectfully requests that this Court issue the attached proposed TRO with asset freeze, appointment of a receiver, immediate access, and other equitable relief, and require Defendants to show cause why a preliminary injunction should not issue.

Respectfully submitted,

Jonathan E. Nuechterlein
General Counsel

Dated:  April 24, 2015

Matthew H. Wernz, IL #6294061
Attorney for Plaintiff
Federal Trade Commission

---

[57]    *See* Certification and Declaration of Plaintiff's Counsel Pursuant to Federal Rule of Civil Procedure 65(b) and Local Rule 7-19.2 in Support of Plaintiff's *Ex Parte* Application for Temporary Restraining Order and *Ex Parte* Application to Temporarily Seal Case File (describing need for *ex parte* relief and citing cases in which defendants who learned of impending FTC action withdrew funds, destroyed vital documents, and fled the jurisdiction).
[58]    McKenney Dec., PX 7, at 149, ¶ 68(b)-(c).