ORIGINAL

1  JONATHAN E. NUECHTERLEIN
   GENERAL COUNSEL
2

3  MATTHEW H. WERNZ
4  mwernz@ftc.gov
   Federal Trade Commission
5  55 West Monroe Street, Suite 1825
   Chicago, Illinois 60603
6  Tel: (312) 960-5634; Fax: (312) 960-5600
7
8  RAYMOND E. MCKOWN (Cal. Bar No. 150975)
   rmckown@ftc.gov
9  Federal Trade Commission
10 10877 Wilshire Boulevard, Suite 700
   Los Angeles, California 90024
11 Tel: (310) 824-4343; Fax: (310) 824-4380
12
13 Attorneys for Plaintiff
   FEDERAL TRADE COMMISSION
14

15              UNITED STATES DISTRICT COURT
16              CENTRAL DISTRICT OF CALIFORNIA

17 FEDERAL TRADE COMMISSION,

18        Plaintiff,                    Case No. CV15-03107 PA (AJWx)

19        v.                           Plaintiff Federal Trade Commission's
20                                     Reply in Support of a Preliminary
                                       Injunction
21 SALE  SLASH,  LLC,  a  California
   limited liability company, *et al.*, Filed Under Seal
22
                                       Pursuant to Seal Order dated April 27,
23        Defendants.                  2015
24
25
26
27
28

                              i

FILED
CLERK U.S. DISTRICT COURT

MAY – 7 2015

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

**ORIGINAL**

1  JONATHAN E. NUECHTERLEIN
2  GENERAL COUNSEL

3  MATTHEW H. WERNZ
   mwernz@ftc.gov
4  Federal Trade Commission
5  55 West Monroe Street, Suite 1825
6  Chicago, Illinois 60603
   Tel: (312) 960-5634; Fax: (312) 960-5600
7
8  RAYMOND E. MCKOWN (Cal. Bar No. 150975)
   rmckown@ftc.gov
9  Federal Trade Commission
10 10877 Wilshire Boulevard, Suite 700
   Los Angeles, California 90024
11 Tel: (310) 824-4343; Fax: (310) 824-4380
12
13 Attorneys for Plaintiff
   FEDERAL TRADE COMMISSION
14

```
              FILED
   CLERK U.S DISTRICT COURT

        MAY - 7 2015

   CENTRAL DISTRICT OF CALIFORNIA
   BY___                  DEPUTY
```

15            UNITED STATES DISTRICT COURT
16            CENTRAL DISTRICT OF CALIFORNIA

17 | FEDERAL TRADE COMMISSION, | Case No. CV15-03107 PA (AJWx)
18 |     Plaintiff, |
19 |     v. | Plaintiff Federal Trade Commission's Reply in Support of a Preliminary Injunction
20 |  |
21 | SALE SLASH, LLC, a California limited liability company, *et al.*, | Filed Under Seal
22 |  |
23 |     Defendants. | Pursuant to Seal Order dated April 27, 2015
24 |  |
25
26
27
28

# TABLE OF CONTENTS

I.   Introduction.................................................................................1

II.  Defendants Are Responsible for the Illegal Business Practices......................2

   A.   Defendants are liable for the illegal spam. ..........................................3

   B.   Defendants are liable for the false weight-loss claims
        and phony endorsements on their and their affiliates'
        fake news websites.. ...............................................................8

   C.   Defendant Vahe Haroutounian was intimately
        involved in Defendants' deceptive affiliate marketing activities. . ......9

III. The Scope of the Proposed Preliminary Injunction is Appropriate .............11

   A.   The FTC Is Likely to Succeed on the Merits .....................................11

   B.   The Scope of the Asset Freeze is Appropriate ...................................12

        1.   The Preliminary Injunction should freeze future
             income or should not allow for living expenses ......................13

        2.   The Preliminary Injunction should apply to all of
             Defendants' assets acquired before the entry of the TRO. .......15

        3.   The asset freeze should apply to Defendant Vahe
             Haroutounian....................................................................17

IV.  Conclusion ...............................................................................18

# TABLE OF AUTHORITIES

## REPORTED CASES

*FTC v. Affordable Media, LLC,*
    179 F.3d 1228 (9th Cir. 1999) ........................................................................11

*FTC v. Bronson Partners, LLC,*
    654 F.3d 359 (2d Cir. 2011) ...........................................................................15

*FTC v. Stefanchik,*
    559 F.3d 924 (9th Cir. 2009) ..........................................................................10

*FTC v. Warner Commc'ns, Inc.,*
    742 F.2d 1156 (9th Cir. 1984) ........................................................................11

*Goodman v. FTC,*
    244 F.2d 584 (9th Cir. 1957) ............................................................................8

*SEC v. Banner Fund Int'l,*
    211 F.3d 602 (D.C. Cir. 2000).................................................................. 15-16

*SEC v. Current Fin. Servs.,*
    62 F. Supp. 2d 66 (D.D.C. 1999) ....................................................................16

*SEC v. Fischbach Corp.,*
    133 F.3d 170 (2d Cir. 1997) ...........................................................................15

*SEC v. Grossman,*
    887 F. Supp. 649 (S.D.N.Y. 1995),
    *aff'd*, 101 F.3d 109 (2d Cir. 1996).................................................................16

*Sw. Sunsites, Inc. v. FTC,*
    785 F.2d 1431 (9th Cir. 1986) ..........................................................................8

*Standard Distributors, Inc. v. FTC,*
    211 F.2d 7 (2nd Cir. 1954) ...............................................................................8

**UNREPORTED CASES**

*FTC v. Phoenix Avatar, LLC,*
     No. 04-cv-2897, 2004 WL 1746698 (N.D. Ill. July 30, 2004)....................3, 4

*United States v. Impulse Media Group, Inc.,*
     No. CV05-1285RSL, 2007 WL 1725560 (W.D. Wash. June 8, 2007)...........4

**STATUTES**

The Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003

15 U.S.C. § 7701 ...........................................................................................3

15 U.S.C. § 7702 ...........................................................................................3

## I.    Introduction

As part of a widespread campaign to market their bogus diet pills, Defendants have paid more than $17 million to affiliate marketers who have lured consumers to Defendants' diet pill websites by plainly illegal means. Those marketers have bombarded consumers with illegal spam emails and have used "fake news" websites that include blatantly false weight loss claims and phony celebrity endorsements, all to trick consumers into buying Defendants' pills.

Defendants concede as much. In opposing the entry of a preliminary injunction, Defendants never suggest that consumers who take Defendants' pills can actually lose 17 pounds in 4 weeks, as represented on the fake news websites. They also produce no evidence that celebrities like Oprah Winfrey really have endorsed their products. And Defendants do not even try to claim that the spam email that lured consumers to their websites is in any way legal. The spam was clearly illegal, and Defendants profited from it.

What Defendants boldly claim instead is that they simply are not responsible for the illegal spam emails and false marketing claims because they purportedly had no knowledge of them. Defendants claim is wrong, both legally and factually.

First, as a purely legal matter, Defendants are responsible for the illegal conduct of the agents they hired to market their diet pills regardless of whether they knew about that conduct or its illegality. When those agents proceeded to

engage in blatantly illegal conduct (a fact not contested by Defendants), Defendants cannot escape liability by claiming, incredibly, that they had no idea that it was occurring.  Defendants profited from the illegal conduct and are responsible for it.

But significantly, Defendants also are wrong on the facts.  It is clear from the evidence already submitted to the Court in connection with the entry of the temporary restraining order, and from the supplemental evidence submitted here, that Defendants knew of the illegal spam emails and false marketing claims. Indeed, Defendants cannot credibly claim that they did not know of the false claims on the fake news websites when they created and used their own fake news websites that made identical false claims.

This Court previously found that the Federal Trade Commission ("FTC") is likely to prevail on the merits of its claims that the Defendants are liable for the alleged conduct, and that a freeze of their assets was warranted.  Nothing about Defendants' sparse filing undermines those findings.  Accordingly, the Court should enter a preliminary injunction, including an asset freeze, against all Defendants.

## II.    Defendants Are Responsible for the Illegal Business Practices

Defendants are liable for spam sent by their agents under the CAN-SPAM

Act[1] and for their affiliates' deceptive claims in violation of the FTC Act.  As noted, Defendants are responsible for this misconduct regardless of whether they knew of it or not, but contrary to the self-serving claims in Defendants' response, the overwhelming evidence conclusively demonstrates that Defendants *were aware* of their affiliates' law violations.  Finally, Defendant Vahe Haroutounian was heavily involved in Defendants' deceptive marketing operation and so is individually liable for its misconduct.

### A.    Defendants are liable for the illegal spam.

The CAN-SPAM Act imposes liability both on the spammers who transmit the offending spam email and on those who "procure" that transmission.  15 U.S.C. § 7702(9).    To "procure" means to "intentionally pay or provide other consideration to, or induce, another person to initiate" a message on one's behalf. *Id.* § 7702(12); *see also FTC v. Phoenix Avatar, LLC*, No. 04-cv-2897, 2004 WL 1746698, at *13 (N.D. Ill. July 30, 2004) ("Liability [under the CAN-SPAM Act] . . . also extends to those who 'procure the origination' of offending spam.").

Defendants admit that they paid the affiliate network, Guru Media, that in turn hired the spammer to send the email spam.  Defendants also do not dispute that such spam led, through the deceptive fake news websites, to Defendants' own websites, where Defendants sold their diet pills.  Indeed, as previously explained in

---

[1]    The Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, 15 U.S.C. § 7701, *et seq.*

the FTC's TRO brief,[2] Defendants' own tracking records indicate that they paid the affiliate that sent the spam emails more than $10 million in commissions.[3] By intentionally paying for the transmission of the spam that led to their websites, Defendants "procured" the transmission of that spam under the CAN-SPAM Act. *Phoenix Avatar*, 2004 WL 1746698, at *13 (finding it "quite likely" that defendants procured and therefore "initiated the transmission of the spam advertising the Web sites" where defendants sold their diet patches.)

Moreover, the record in this case is replete with evidence that Defendants willingly paid for emails, and in fact knew of the illegal spam they procured.[4] The Defendants paid so much money for so long—more than $10 million paid over more than one year—that their belated claims of ignorance of the illegal spam simply are not credible.

---

[2]    *See* Memorandum in Support of Plaintiff's *Ex Parte* Application for Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue, filed Apr. 27, 2015.

[3]    Declaration of Douglas McKenney, Declaration of Douglas M. McKenney ("McKenney Dec."), Plaintiff's Exhibit ("PX") 7, at 142-43, ¶ 49(d) (showing Defendants paid more than $10.2 million to email marketer "39"); *id.* at 129-30, ¶ 13, at 131, ¶ 16, at 134, ¶ 26, & at 138-39, ¶¶ 37-38 (showing that marketer "39" sent subject spam email).  PX1 through PX7 are located in the Declarations in Support of Memorandum in Support of Plaintiff's *Ex Parte* Application for Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue, filed Apr. 27, 2015.

[4]    *See United States v. Impulse Media Group, Inc.*, No. CV05-1285RSL, 2007 WL 1725560, at *3 (W.D. Wash. June 8, 2007).

To have been blind to the spam sent on their behalf, as they claim, Defendants would have needed to ask absolutely no questions about the millions of dollars they spent.   Defendants also would have known less about their own business than:

- a Yahoo investigator who visited Defendants' websites from the illegal spam several times beginning in June 2014;[5]

- FTC investigators who clicked on the links in the spam to Defendants' websites several times between September 2014 and February 2015, even purchasing Defendants' bogus diet products;[6] and

- a consumer who was deceived by the illegal spam into purchasing Defendants' products in October 2014 and who, once he realized he was deceived, *complained to Defendants' customer service number.*[7]

In fact, Defendants routinely handled—but did nothing about—complaints of spam being sent from compromised accounts that led to their websites.  Training materials found on Defendants' business premises indicate that *as early as June 2014*, Defendants trained their employees on an issue labeled "Spam Email

---

[5]     Declaration of H. Jacqueline Brehmer ("Brehmer Dec."), PX 3, at 23-24, ¶¶ 11-12.
[6]     McKenney Dec., PX 7, at 128-37, ¶¶ 11-34.
[7]     Declaration of Richard Holland ("Holland Dec."), PX 1, at 7, ¶ 14.

Response."[8]  This training included a script entitled "<u>SPAM EMAIL RESPONSE</u>" that was found in the work stations in Defendants' call center.  The script instructed call center agents to respond to consumer complaints about the spam emails by stating:

- "We assure you that we do not have any type of access whatsoever to your email system;" and

- "Can I have your email address and any other email address that was compromised, please?"[9]

Thus, despite Defendants' claim in their brief to have learned of the spam emails only in March 2015, this script clearly shows that Defendants not only were aware of the spam emails being sent on their behalf as early as June 2014, but also that they were specifically aware that the emails were being sent from hacked accounts.

Defendants' knowledge of the spam emails is also demonstrated by the fact that they tracked commissions related to those emails separately from other affiliate commissions.  In their brief, Defendants admit that the spam was sent by

---

[8]     Declaration of Joseph F. Einikis III ("Einikis Dec."), PX 8, at 6 (Att. A) (showing employee "Retraining Checklist" dated June 11, 2014 with the item, "Spam Email Response").
[9]     Einikis Dec., PX 8, at 7-8 (Att.A).

an affiliate that they retained through an affiliate network called Guru Media.[10]  In their tracking account, Defendants identify Guru Media as an affiliate network that they have paid more than $5.4 million.  That $5.4 million does not include the commissions that Defendants paid to the email spammer.  Those commissions were tracked separately, not as regular traffic originating through Guru.

To track the email spam commissions, Defendants created a new affiliate in their tracking account, under the pseudonym "Winner Master,"[11] that purportedly was separate from Guru Media.  Defendants classified "Winner Master" as an "email" affiliate,[12] and they paid "Winner Master" more than $10 million over more than one year for the spam on top of the $5.4 million they paid to Guru Media.

Guru Media and "Winner Master" likely are one and the same.  Guru Media's invoices to Defendants included both the spam email commissions and other commissions, and the spam email commissions were labeled on the invoices with the identical pseudonym "Winner."[13]  The only explanation for these dual accounts—one for non-spamming traffic from Guru Media, the other for the illegal spam—is that Defendants were feebly trying to hide their own and Guru Media's

---

10    *See, e.g.*, Defendants' Response to Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Defs. Resp."), at 2-3.
11    McKenney Dec., PX 7, at 142-43, ¶ 49.
12    *Id.*, at 142-43, ¶ 49(a).
13    Einikis Dec. PX 8, at 11-14 (Att. D).

involvement in the spam.  But they only would have done that if they knew of the

spam emails, which they clearly did.

### B.    Defendants are liable for the false weight-loss claims and phony endorsements on their and their affiliates' fake news websites.

As with the spam sent on their behalf, Defendants did not need to know that

their affiliates were marketing through fake news websites to be responsible for the

deceptive claims made on those websites.  Defendants' affiliates are their agents,

and Defendants do not argue to the contrary in their brief.  As such, Defendants are

responsible for their deceptive acts or practices in violation of the FTC Act.  *See*

*FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir. 2009) (citing *Sw. Sunsites, Inc. v.*

*FTC*, 785 F.2d 1431, 1438 (9th Cir. 1986)); *Standard Distributors, Inc. v. FTC*,

211 F.2d 7, 13 (2nd Cir. 1954) (defendant liable despite unsuccessful efforts to

prevent agents' misrepresentations).  "[T]he principal is bound by the acts of the

salesperson he chooses to employ, if within the actual or apparent scope of his

authority, even when unauthorized."  *Goodman v. FTC*, 244 F.2d 584, 592 (9th

Cir. 1957).  Defendants chose to employ their affiliates, and cannot avoid liability

by claiming they did not monitor or know of those affiliates' deceptive claims.

Moreover, Defendants clearly did know that their affiliates were making

false claims on the fake news websites.  Defendants fail to mention in their

response that *they also maintained their own deceptive fake news websites*,[14] which were identical to those being used by their spammer and other affiliates.[15] Defendants' contention in their response that they were ignorant of the false marketing claims simply is not plausible when those claims appeared on Defendants' own fake news websites, as well as the fake news websites of affiliate marketers to whom Defendants paid $17 million.[16] Defendants' tracking platform showed them every website from which their affiliates lured consumers to Defendants' websites, including every fake news website used by those affiliates.[17] Defendants were able to and likely did review those websites, since the content was identical to their own fake news websites.

---

[14] *See* McKenney Dec., PX 7, at 131-33, ¶¶ 17-23, at 186-92 (Att. D), at 193-202 (Att. E) (showing fake news websites operated by Defendants leading to Defendants' diet-pill websites); *see also id.* at 146, ¶ 56, at 146-47, ¶ 60, at 148, ¶ 65, & at 150-51, ¶ 71(a) (showing Defendants' fake news websites were registered from Defendants' place of business).

[15] *Compare id.* at 186-89 (Att. D) (showing fake news websites operated by Defendants) *with id.* 178-82 (Att. C) showing fake news websites operated by Defendants's spammer).

[16] As discussed in the FTC's TRO brief, this $17 million figure includes both (1) more than $10 million paid for spam that led to fake news websites and on to Defendants' diet-pill websites and also (2) more than $7 million paid to Defendants' affiliate Talisman Media, LLC, which likewise marketed through fake news websites. *Id.* at 128, ¶ 9, at 157, Att. A, at 144, ¶ 50, & at 148, ¶ 64. Defendants do not deny that they are responsible for Talisman Media's deceptive affiliate marketing.

[17] *Id.* at 142-44, ¶ 49 (showing fake news websites leading consumers to purchase several of Defendants' products).

### C. Defendant Vahe Haroutounian was intimately involved in Defendants' deceptive affiliate marketing activities.

Defendants' contention that Defendant Vahe Haroutounian only "completed the online order form" for Defendants' tracking services is wrong on the facts, and their contention that he is not liable for the illegal conduct because he is "not an owner, officer, director or employee of the Defendants businesses" is wrong on the law.[18]  In reality, Haroutounian was critically involved in Defendants' business, and his individual participation in and authority to control the illegal conduct renders him liable for it. *Stefanchik*, 559 F.3d at 931.

First, Defendant Haroutounian was present at Defendants' business location when the receiver assumed control of the business, and he maintained a regular desk one door down from defendant Artur Babayan.[19]  Haroutounian also signed contracts for Defendants' marketing services,[20] received invoices from affiliate marketers addressed to defendant Sale Slash, LLC,[21] and corresponded by email with the company that maintained Defendants' tracking software.[22]  He used his home Internet connection to access that tracking software on nearly 300 occasions. From the same home connection, Haroutounian logged into Defendants' website

---

[18]  Defs. Resp. at 4-5.
[19]  Einikis Dec, PX 8, at 2-3, ¶ 8.
[20]  McKenney Dec., PX 7, at 139, ¶ 41.
[21]  Einikis Dec, PX 8, at 9 (Att. A).
[22]  McKenney Dec., PX 7, at 140, ¶ 43.

registration account regularly.[23]  Guru Media sent its coded "Winner" invoices relating to the spam email marketing campaign to "Prisma Profits," the unincorporated business name Haroutounian used to register the tracking account.[24]  Haroutounian, the defendant business entities, and defendant Babayan all engaged in the same business from the same warehouse and are similarly liable.

## III.   The Scope of the Proposed Preliminary Injunction is Appropriate[25]

### A.     The FTC Is Likely to Succeed on the Merits

As the Court found in entering the TRO against the Defendants, the FTC is likely to prevail on the merits in this case.  A preliminary injunction is warranted where the FTC has demonstrated that (1) it is likely to succeed on the merits, and (2) a balancing of the equities favors the entry of the injunction.  *See FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999) (citing *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984)).[26]

---

[23]     *Id.* at 140-41, ¶ 44, at 145-46, ¶¶ 55 & 59, and at 148-49, ¶ 66.

[24]     Einikis Dec, PX 8, at 11-14 (Att. A).

[25]     The FTC will submit a proposed Preliminary Injunction on May 8, in advance of the May 11 hearing.

[26]     In their brief, Defendants cite the standard for the entry of preliminary injunction between private parties.  As Defendants belatedly acknowledge in a footnote, this private-party standard does not apply to FTC Act cases. Defs. Resp., at 5 & n.1.

Defendants do not argue that the balancing of the equities favors rejection of the preliminary injunction and so have waived that argument, leaving only the question of whether the FTC is likely to succeed on the merits.

The FTC is likely to succeed in showing that Defendants are responsible for conduct that the FTC has shown, and that Defendants concede, is illegal. As noted above, Defendants have raised no argument that any of the charged conduct—the false weight-loss claims, the phony celebrity endorsements, or the blatantly illegal spam—is legal. The FTC has submitted evidence to show the illegality of each of these practices: an expert declaration that the weight-loss claims are false,[27] declarations from representatives of Oprah Winfrey and "The Doctors" television show that those celebrities images were falsely used in Defendants' marketing materials,[28] and consumer declarations and other evidence that Defendants' spam violates the CAN-SPAM Act in several ways.[29]

As further explained above, Defendants are principals liable for the deceptive acts of their agents and are liable for the offending spam because they procured it. The CAN-SPAM Act and FTC Act do not require that Defendants know of the illegal conduct to be liable for it, although Defendants clearly did know. Defendants' knowledge is shown by evidence of their deliberate, careful planning—setting up anonymous tracking accounts, registering websites with falsified information, and training their employees to deny any involvement in the spam—that would defer and avoid the day of reckoning.

---

[27] *See* Declaration of David A. Levitsky, Ph.D., PX 6, at 66-123.
[28] *See* Declaration of Bernard Gugar, PX 4, at 35-50; *see also* Declaration of Kristen Fischer, PX 5, at 51-65.
[29] *See, e.g.,* Declaration of Michael Palmer, PX 2, at 13-19.

**B.    The Scope of the Asset Freeze is Appropriate**

In their brief, Defendants do not argue that the FTC failed to prove that Defendants were likely to dissipate assets or that the Court should not have entered an asset freeze as part of the TRO.[30]    The FTC provided such proof in its TRO memo, noting that Defendants had used falsified website registration information, mailboxes that did not relate to their actual place of business, and anonymous email sent from hacked accounts to mask their identity from consumers.[31] Defendants likewise do not contest the imposition of an asset freeze against Defendants Sale Slash, LLC, Purists Choice LLC, or Artur Babayan.    Instead, Defendants argue that the asset freeze should not apply to (1) Defendants' future, unrelated income; (2) Defendants' pre-TRO income earned in other lines of work; and (3) the assets of Defendant Haroutounian.

**1.    The Preliminary Injunction should freeze future income or should not allow for living expenses.**

Courts in this District and elsewhere have routinely entered temporary and preliminary injunctive orders that freeze defendants' assets, both present and after-acquired. [32]    Orders freezing defendants' future assets—like the TRO entered in

---

[30]    *See* Defs.' Resp. at 10.
[31]    *See* TRO Memo, at 23.
[32]    *See, e.g., FTC v. Applied Mktg. Servs., LLC*, CV-13-6794-CAS (CWx), Dkt. # 18, at 10 (Sept. 30, 2013) (entering Preliminary Injunction including asset freeze) ("The funds, property, and assets affected by this [Asset Freeze] shall include both existing assets and assets acquired after the effective date of this Order.").

this case—typically allow for the release from the frozen assets of living expenses to defendants.[33]  Orders that do not apply to defendants' future, unrelated income typically do not allow for the release of living expenses.  Indeed, three orders cited by Defendants allowed for the defendants in those cases to keep future, unrelated income but did not separately allow for the release of living expenses from the frozen assets.[34]

The FTC would agree to the exclusion from the asset freeze of future, unrelated income.  Indeed, after the filing of Defendants' brief, FTC counsel proposed such an exclusion to defense counsel as part of a proposed Stipulated Preliminary Injunction.  However, the FTC would not agree to a wholesale release of future, unrelated income <u>and</u> to the release of living expenses, as those two releases would be duplicative.  Nor should the Court order such duplicative relief, as Defendants could easily dissipate what assets are available for consumer restitution.

---

[33]  In the TRO, the Court conditioned the release of living expenses on Defendants' completion of financial statements disclosing their assets.  Defendants have not completed those statements, but are scheduled to do so by Friday, May 8.  As a result, Defendants have not asked for and the FTC has not agreed to the release of any living expenses.

[34]  *See FTC v. In Deep Servs.*, CV-09-01193- SGL, Dkt. # 36, at 9 (C.D. Cal. June 23, 2009); *FTC v. Health Formulas, LLC*, Case No. Case 2:14-cv-01649-RFB-GWF , Dkt. # 149, at 42 (May 6, 2015); *FTC v. Consumer Advocates Group Experts, LLC*, No. cv-12-4736-DDP, Dkt. #23, at 15-16 (C.D. Cal. May 30, 2012)

**2.     The Preliminary Injunction should apply to all of Defendants' assets acquired before the entry of the TRO.**

Defendants urge this Court to exclude from the asset freeze "assets that pre-date the TRO, but which were generated from unrelated businesses." (Defs. Resp. at 10.)    Defendants provide no explanation of these purportedly "unrelated businesses" and also cite no authority to support the exclusion of such assets. Defendants are mistaken: the FTC is seeking full restitution for all money lost by consumers to Defendants' deceptive and illegal scheme.     Restitution or disgorgement in an enforcement action by a public agency is not limited to particular assets obtained by defendants from their unlawful activity, but rather includes all of the defendants' assets, up to the amount of their potential liability.

As the Court of Appeals for the Second Circuit has stated, "disgorgement does not require the district court to apply equitable tracing rules to identify specific funds in the defendant's possession that are subject to return. . . . [W]hen a public entity seeks disgorgement it does not claim any entitlement to particular property; it seeks only to 'deter violations of the . . . laws by depriving violators of their ill-gotten gains.'" *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir. 2011) (quoting *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997)).   The Court of Appeals for the D.C. Circuit explained why public agencies are not subject to a tracing requirement:

> [T]he requirement of a causal relationship between a wrongful act and the property to be disgorged does not imply that a court may order the malefactor to disgorge only the actual property obtained by means of his wrongful act. Rather, the causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge. To hold . . . that a court may order a defendant to disgorge only the actual assets unjustly received would lead to absurd results. Under [such an] approach, for example, a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement. [This] would be a monstrous doctrine for it would perpetuate rather than correct an inequity.

*SEC v. Banner Fund Int'l,* 211 F.3d 602, 617 (D.C. Cir. 2000).

As the *Banner Fund* court recognized, Defendants' liability extends not just to those remaining assets that are specifically traceable to their misconduct, but rather "to . . . a sum equal to the amount wrongfully obtained." *Id.* Applying this principle, courts have rejected traceability arguments as the basis for releasing funds from an asset freeze at preliminary stages like this one. *See, e.g., SEC v. Current Fin. Servs.,* 62 F. Supp. 2d 66, 69 (D.D.C. 1999) (declining to release frozen assets for payment of attorneys' fees and finding it "irrelevant that funds are not traceable" to wrongdoing); *see also SEC v. Grossman,* 887 F. Supp. 649, 661 (S.D.N.Y. 1995) ("[I]t is irrelevant whether the funds affected by the Asset Freeze are traceable to the illegal activity."), *aff'd,* 101 F.3d 109 (2d Cir. 1996).

Based on uniform authority that asset freezes requested by public agencies like the FTC are not subject to tracing requirements, this Court should not exclude from the asset freeze anything made by Defendants before the entry of the TRO.

### 3. The asset freeze should apply to Defendant Vahe Haroutounian.

Defendants urge this Court to lift the asset freeze on Defendant Haroutounian for the same reason they urge that he should not be subject to a preliminary injunction—his purported lack of involvement in the charged practices. As described in Section II.C above, Defendant Haroutounian individually participated in and had the authority to control the charged practices. He worked at Defendants' premises, playing a central role in Defendants' affiliate marketing enterprise, and should not be excluded from the preliminary injunction generally or the asset freeze specifically just because he was not listed as an officer or owner of the corporate defendants.[35]

---

[35] Defendants also ask the Court, if it is inclined to grant a preliminary injunction against them, for more time for supplemental briefing. Defs. Resp. at 8-9. Defendants' filing does not provide any explanation of the issues or evidence that would be addressed in the requested supplemental briefing. Defense counsel claims that they have not had sufficient time to review the FTC's materials, but they have full access to Defendants, who presumably can adequately brief their attorneys on their business practices. Moreover, the Court entered a temporary restraining order against Defendants with a fourteen-day duration, the maximum period allowed by the Federal Rules of Civil Procedure. Fed. R. Civ. P. 65(b)(2). Defendants should not be afforded two bites at the apple, particularly given the clear-cut nature of the issues and Defendants' failure to raise any issue that would benefit from supplemental briefing. As a result, the Court should not continue the preliminary injunction hearing and should not allow supplemental briefing, particularly of the unspecified nature requested by Defendants.

**IV.   Conclusion**

In entering the TRO in this matter, this Court already found that the FTC is likely to succeed on the merits of its claims and that an asset freeze was necessary and appropriate.   The evidence submitted by the FTC here—that Defendants clearly knew of the illegal spam sent on their behalf and continued to pay for and profit from it—only reinforces those findings.   This Court should enter a full preliminary injunction against all Defendants, including an asset freeze.

Respectfully submitted,

Jonathan E. Nuechterlein
General Counsel

Dated:  May 7, 2015

Matthew H. Wernz, IL #6294061
Attorney for Plaintiff
Federal Trade Commission