JONATHAN E. NUECHTERLEIN
GENERAL COUNSEL

MATTHEW H. WERNZ
GUY G. WARD
mwernz@ftc.gov
gward@ftc.gov
Federal Trade Commission
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
Tel: (312) 960-5596; Fax: (312) 960-5600

RAYMOND E. MCKOWN (Cal. Bar No. 150975)
rmckown@ftc.gov
Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
Tel: (310) 824-4343; Fax: (310) 824-4380

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>SALE SLASH, LLC, a California limited liability company, *et al.*,<br><br>    Defendants. | Case No. CV15-03107 PA (AJWx)<br><br>Stipulated Order for Permanent Injunction and Monetary Judgment |

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed its

Amended Complaint For Permanent Injunction and Other Equitable Relief

("Complaint"), pursuant to Sections 13(b) and 19 of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57(b), and Section 7(a) of

the Controlling the Assault of Non-Solicited Pornography and Marketing Act of

2003 (the "CAN-SPAM Act"),  15 U.S.C. § 7706(a).  The Commission and

Defendants Sale Slash, LLC, Purists Choice LLC, Optim Products LLC, Edgar

Babayan, Artur Babayan, and Vahe Haroutounian (collectively, "Stipulating

Defendants"), stipulate to the entry of this Stipulated Order for Permanent

Injunction and Monetary Judgment ("Order") to resolve all matters in dispute in

this action between them.

**THEREFORE, IT IS ORDERED** as follows:

**FINDINGS OF FACT**

1.      This Court has jurisdiction over this matter.

2.      The Complaint charges that Defendants have engaged in deceptive

and illegal acts or practices that violate Sections 5(a) and 12 of the FTC Act, 15

U.S.C. §§ 45(a) & 52, and Section 5(a) of the CAN-SPAM Act, 15 U.S.C.

§ 7704(a), in the advertising, marketing, promoting, offering for sale, or selling of

dietary supplements online, including through commercial electronic mail

messages.

3.      Stipulating Defendants neither admit nor deny any of the allegations

in the Complaint, except as specifically stated in this Order.  Only for purposes of

this action, Stipulating Defendants admit the facts necessary to establish jurisdiction.

4.     Stipulating Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5.     Stipulating Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## DEFINITIONS

For the purposes of this Order, the following definitions shall apply:

1.     "**Affiliate**" means any person, including third-party marketers, who participates in an affiliate program.

2.     "**Affiliate Network**" means any person who provides another person with affiliates for an affiliate program or whom any person contracts with as an affiliate to promote any product, service, or program.

3.     "**Affiliate Program(s)**" means (a) any arrangement under which any marketer or seller of a product, service, or program pays, offers to pay, or provides or offers to provide any form of consideration to any Stipulating Defendant, either directly or through an affiliate network, to (i) provide the marketer or seller with, or refer to the marketer or seller, potential or actual customers; or (ii) otherwise

market, advertise, or offer for sale the product or service on behalf of the marketer or seller; or (b) any arrangement under which any Stipulating Defendant pays, offers to pay, or provides or offers to provide any form of consideration to any third party, either directly or through an affiliate network, to (i) provide any Stipulating Defendant with, or refer to any Stipulating Defendant, potential or actual customers; or (ii) otherwise market, advertise, or offer for sale any product, service, or program on behalf of any Stipulating Defendant.

4. **"Clear(ly) and conspicuous(ly)**" means that a required disclosure is difficult to miss (*i.e.*, easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

a. In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication, even if the representation requiring the disclosure is made in only one means.

b. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

c.     An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

d.     In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

e.      The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

f.     The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

g.     The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

h.     When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

5.     "**Commercial electronic mail message**" (or "**commercial email**") means any electronic mail message the primary purpose of which is the commercial advertisement or promotion of a commercial product or service

(including the content on an Internet website operated for commercial purposes). 15 U.S.C. § 7702(2).

6. "**Corporate Defendants**" means Sale Slash, LLC, a California limited liability company, Purists Choice LLC, a California limited liability company, Optim Products LLC, a California limited liability company, Apex Customer Care LLC, a California limited liability company, Penway LLC, a California limited liability company, and Renvee LLC, a California limited liability company, and their successors and assigns.

7. "**Cosmetic**" means:

    a.    articles to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof intended for cleansing, beautifying, promoting attractiveness, or altering the appearance; and

    b.    articles intended for use as a component of any such article; except that such term shall not include soap. 15 U.S.C. § 55(e).

8. "**Covered Product**" means any dietary supplement, food, drug, or cosmetic product.

9. "**Defendants**" means all of the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.

10. "**Dietary supplement**" means:

Page 6 of 56

a.    any product labeled as a dietary supplement or otherwise represented as a dietary supplement; or

b.    any pill, tablet, capsule, powder, softgel, gelcap, liquid, or other similar form containing one or more ingredients that is a vitamin, mineral, herb or other botanical, amino acid, probiotic, or other dietary substance to supplement the diet by increasing the total dietary intake, or a concentrate, metabolite, constituent, extract, or combination of any ingredient described above, that is intended to be ingested, and is not represented to be used as a conventional food or as a sole item of a meal or the diet.

11.    "**Drug**" means:

a.    articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them;

b.    articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals;

c.    articles (other than food) intended to affect the structure or any function of the body of man or other animals; and

d.    articles intended for use as a component of any article specified in subsection (a), (b), or (c); but does not include devices or their components, parts, or accessories. 15 U.S.C. § 55(c).

12. "**Electronic mail message**" (or "**email**") means a message sent to a unique electronic mail address. 15 U.S.C. § 7702(6).

13. "**Electronic mail address**" means a destination, commonly expressed as a string of characters, consisting of a unique user name or mailbox (commonly referred to as the "local part") and a reference to an Internet domain (commonly referred to as the "domain part"), whether or not displayed, to which an electronic mail message can be sent or delivered. 15 U.S.C. § 7702(5).

14. "**Essentially equivalent product**" means a product that contains the identical ingredients, except for inactive ingredients (*e.g.*, binders, colors, fillers, excipients), in the same form and dosage, and with the same route of administration (*e.g.*, orally, sublingually), as the Covered Product; *provided that* the Covered Product may contain additional ingredients if reliable scientific evidence generally accepted by experts in the relevant field indicates that the amount and combination of additional ingredients is unlikely to impede or inhibit the effectiveness of the ingredients in the Essentially Equivalent Product.

15. "**Food**" means

    a. articles used for food or drink for man or other animals;

    b. chewing gum; and

    c. articles used for components of any such article. 15 U.S.C. § 55(b).

16. "**Header information**" means the source, destination, and routing information attached to an electronic mail message, including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message. 15 U.S.C. § 7702(8).

17. "**Individual Defendants**" or "**Stipulating Individual Defendants**" means Edgar Babayan, Artur Babayan, and Vahe Haroutounian, also known as Vaheh Haroutounian, also d/b/a Prisma Profits.

18. "**Initiate**," when used with respect to a commercial electronic mail message, means to originate or transmit such message or to procure the origination or transmission of such message. 15 U.S.C. § 7702(9).

19. "**Person**" means a natural person, an organization or other legal entity, including a corporation, partnership, sole proprietorship, limited liability company, association, cooperative, or any other group or combination acting as an entity.

20. "**Plaintiff**," "**Commission**," or "**FTC**" means the Federal Trade Commission.

21. "**Preliminary Injunction**" means the Preliminary Injunction entered in this matter on May 12, 2015 (Dkt. No. 33).

22.     "**Procure**," when used with respect to the initiation of a commercial electronic mail message, means intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf.  15 U.S.C. § 7702(12).

23.     "**Reliably reported**," for a human clinical test or study ("test"), means a report of the test has been published in a peer-reviewed journal, and such published report provides sufficient information about the test for experts in the relevant field to assess the reliability of the results.

24.     "**Receiver**" means Robb Evans and Associates, LLC, appointed as Permanent Equity Receiver over Receivership Defendants pursuant to Section X of the Preliminary Injunction.

25.     "**Receivership Defendants**" means Sale Slash, LLC, a California limited liability company and Purists Choice LLC, a California limited liability company, and their successors and assigns, as well as any subsidiaries, affiliates, divisions, or business names created or used by these entities, including, but not limited to, Apex Customer Care LLC, a California limited liability company, E-Level Marketing Inc., a California corporation, Future DNA LLC, a California limited liability company, Geneva Shox LLC, a California limited liability company, Genix Marketing LLC, a California limited liability company, Lead Kings LLC, a California limited liability company, Optim Products LLC, a

California limited liability company, Penway LLC, a California limited liability company, Renvee LLC, a California limited liability company, and Vita Fuse LLC, a California limited liability company.

26.     "**Sender**" means a person who initiates a commercial electronic mail message and whose product, service, or Internet website is advertised or promoted by the message.  15 U.S.C. § 7702(16).

27.     "**Stipulating Corporate Defendants**" means Sale Slash, LLC, a California limited liability company, Purists Choice LLC, a California limited liability company, and Optim Products LLC, a California limited liability company, and their successors and assigns.

28.     "**Stipulating Defendants**" means all of the Individual Defendants and the Stipulating Corporate Defendants, individually, collectively, or in any combination.

29.     "**TRO**" means the *Ex Parte* Temporary Restraining Order with an Asset Freeze, Appointment of a Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue entered in this matter on April 27, 2015.

# I.

## **PROHIBITED WEIGHT-LOSS CLAIMS**

**IT IS ORDERED** that Stipulating Defendants, Stipulating Defendants'

officers, agents, employees, and attorneys, and all other persons in active concert

or participation with any of them, who receive actual notice of this Order, whether

acting directly or indirectly, in connection with the manufacturing, labeling,

advertising, promoting, offering for sale, sale, or distribution of any Covered

Product, are permanently restrained and enjoined from making, or assisting others

in making, expressly or by implication, including through the use of a product

name, endorsement, depiction, or illustration, any representation that:

A.      Such Covered Product causes or assists in causing, weight loss, or any

specific amount of weight loss;

B.      Such Covered Product causes, or assists in causing, rapid weight loss;

or

C.      Consumers who use the Covered Product can generally expect to

achieve the weight loss results represented by an endorser of such product;

unless the representation is non-misleading and, at the time of making such

representation, Stipulating Defendants possess and rely upon competent and

reliable scientific evidence that substantiates that the representation is true.  For

purposes of this Section, competent and reliable scientific evidence shall consist of

human clinical testing of the Covered Product, or of an Essentially Equivalent

Product, that is sufficient in quality and quantity based on standards generally

accepted by experts in the relevant field, when considered in light of the entire

body of relevant and reliable scientific evidence, to substantiate that the

representation is true. Such testing shall be: (1) randomized, double-blind, and

placebo-controlled; and (2) conducted by researchers qualified by training and

experience to conduct such testing. In addition, all underlying or supporting data

and documents generally accepted by experts in the relevant field as relevant to an

assessment of such testing as described in the Section entitled "Preservation of

Records Relating to Competent and Reliable Human Clinical Tests or Studies"

must be available for inspection and production to Plaintiffs. Stipulating

Defendants shall have the burden of proving that a product satisfies the definition

of Essentially Equivalent Product.

## II.

### PROHIBITED REPRESENTATIONS:
### <u>OTHER HEALTH-RELATED CLAIMS</u>

**IT IS FURTHER ORDERED** that Stipulating Defendants, Stipulating

Defendants' officers, agents, employees, and attorneys, and all other persons in

active concert or participation with any of them, who receive actual notice of this

Order, whether acting directly or indirectly, in connection with the manufacturing,

labeling, advertising, promotion, offering for sale, sale, or distribution of any

Covered Product, are permanently restrained and enjoined from making, or assisting others in making, directly or by implication, including through the use of a product name, endorsement, depiction, or illustration, any representation about the health benefits, safety, performance, or efficacy of any Covered Product, unless the representation is non-misleading, and, at the time of making such representation, Stipulating Defendants possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

For purposes of this Section, competent and reliable scientific evidence means tests, analyses, research, or studies (1) that have been conducted and evaluated in an objective manner by qualified persons; (2) that are generally accepted in the profession to yield accurate and reliable results; and (3) as to which, when they are human clinical tests or studies, all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of such testing as set forth in the Section entitled Preservation of Records Relating to Competent and Reliable Human Clinical Tests or Studies are available for inspection and production to Plaintiff.

## III.

## PROHIBITED REPRESENTATIONS
## REGARDING TESTS, STUDIES, OR INGREDIENTS

**IT IS FURTHER ORDERED** that Stipulating Defendants, Stipulating Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product are permanently restrained and enjoined from misrepresenting, in any manner, expressly or by implication, including through the use of any product name, endorsement, depiction, or illustration:

A.  That any Covered Product is clinically proven to cause weight loss;

B.  That the benefits of any Covered Product or service are scientifically proven; or

C.  The existence, contents, validity, results, conclusions, or interpretations of any test, study, or research.

## IV.

## FDA-APPROVED CLAIMS

**IT IS FURTHER ORDERED** that nothing in this Order shall prohibit Stipulating Defendants from:

A.  Making any representation for any drug that is permitted in labeling

for such drug under any tentative or final monograph promulgated by the Food and Drug Administration, or under any new drug application approved by the Food and Drug Administration; and

      B.    Making any representation for any product that is specifically permitted in labeling for such product by regulations promulgated by the Food and Drug Administration pursuant to the Nutrition Labeling and Education Act of 1990 or permitted under Sections 303-304 of the Food and Drug Administration Modernization Act of 1997.

**V.**

### PRESERVATION OF RECORDS RELATING TO COMPETENT AND RELIABLE HUMAN CLINICAL TESTS OR STUDIES

      **IT IS FURTHER ORDERED** that, with regard to any human clinical test or study ("test") upon which Stipulating Defendants rely to substantiate any claim covered by this Order, Stipulating Defendants shall secure and preserve all underlying or supporting data and documents generally accepted by experts in the field as relevant to an assessment of the test, including, but not necessarily limited to:

      A.    All protocols and protocol amendments, reports, articles, write-ups, or other accounts of the results of the test, and drafts of such documents reviewed by the test sponsor or any other person not employed by the research entity;

      B.    All documents referring or relating to recruitment; randomization;

instructions, including oral instructions, to participants; and participant

compliance;

C.     Documents sufficient to identify all test participants, including any

participants who did not complete the test, and all communications with any

participants relating to the test; all raw data collected from participants enrolled in

the test, including any participants who did not complete the test; source

documents for such data; any data dictionaries; and any case report forms;

D.     All documents referring or relating to any statistical analysis of any

test data, including, but not limited to, any pretest analysis, intent-to-treat analysis,

or between-group analysis performed on any test data; and

E.     All documents referring or relating to the sponsorship of the test,

including all communications and contracts between any sponsor and the test's

researchers.

*Provided, however,* the preceding preservation requirement shall not apply

to a reliably reported test, unless the test was conducted, controlled, or sponsored,

in whole or in part by:  (1) any Stipulating Defendant; (2) any Stipulating

Defendant's officers, agents, representatives, or employees; (3) any other person or

entity in active concert or participation with any Stipulating Defendant; (4) any

person or entity affiliated with or acting on behalf of any Stipulating Defendant;

(5) any supplier of any ingredient contained in the product at issue to any of the

foregoing or to the product's manufacturer; or (6) the supplier or manufacturer of such product.

For any test conducted, controlled, or sponsored, in whole or in part, by Stipulating Defendants, Stipulating Defendants must establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of any personal information collected from or about participants. These procedures shall be documented in writing and shall contain administrative, technical, and physical safeguards appropriate to Stipulating Defendants' size and complexity, the nature and scope of Stipulating Defendants' activities, and the sensitivity of the personal information collected from or about the participants.

## VI.

## PROHIBITED BUSINESS ACTIVITIES

**IT IS FURTHER ORDERED** that Stipulating Defendants, Stipulating Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promotion, offering for sale, or sale of any product, service, or program, are permanently restrained and enjoined from:

A. Misrepresenting, or assisting others in misrepresenting, expressly or by implication, any material fact, including, but not limited to:

1.  that any product, service, or program is or has been used, endorsed, or approved by specifically identified individuals, including celebrities such as Oprah Winfrey, Rachel Ray, and any doctor featured on The Doctors television show;

2.  that any consumer testimonial reflects typical consumer experiences with a product, service, or program;

3.  that any website or other publication is an objective news report;

4.  that objective news reporters have performed independent tests of any product, service, or program, including, but not limited to, any Covered Product;

5.  that independent tests demonstrate the effectiveness of any product, service, or program featured in any website or other publication, including, but not limited to, any Covered Product;

6.  the total cost to purchase, receive, or use a product, service, or program;

7.  any material restrictions, limitations, or conditions to purchase, receive, or use a product, service, or program;

8.  any material aspect of the performance, efficacy, nature, or central characteristics of a product, service, or program; and

9.    any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for a product, service, or program.

B.    Failing to, in connection with the advertising, promotion, marketing, offering for sale, sale, or provision of any product, service, or program through an Affiliate Program:

1.    Require each Affiliate and/or Affiliate Network to provide to Stipulating Defendants the following identifying information:

a.    In the case of a natural person, the Affiliate's or Affiliate Network's first and last name, physical address, country, telephone number, email address, and complete bank account information as to where payments are to be made to that person;

b.    In the case of a business entity, the Affiliate's or Affiliate Network's name and any and all names under which it does business, state of incorporation, registered agent, and the first and last name, physical address, country, telephone number, and email address for at least one natural person who owns, manages, or controls the Affiliate or Affiliate Network, and the complete bank account information as to where payments are to be made to the Affiliate or Affiliate Network;

c.    If Stipulating Defendants have access to certain Affiliates only through an Affiliate Network, then Stipulating Defendants shall contractually

require each Affiliate Network to obtain and maintain from those Affiliates the identifying information set forth in Subsection B.1.a and B.1.b of this Section prior to the Affiliate's or Affiliate Network's participation in any Stipulating Defendant's Affiliate Program.

2.      As a condition of doing business with any Affiliate or Affiliate Network or such Affiliate or Affiliate Network's acceptance into any Stipulating Defendant's Affiliate Program: (a) provide each such Affiliate or Affiliate Network a copy of this Order; (b) obtain from each such Affiliate or Affiliate Network a signed and dated statement acknowledging receipt of this Order and expressly agreeing to comply with those provisions of this Order; and (c) clearly and conspicuously disclose in writing that engaging in acts or practices prohibited by this Order will result in immediate termination of any Affiliate or Affiliate Network and forfeiture of all monies owed to such Affiliate or Affiliate Network; *provided, however*, that if Stipulating Defendants have access to certain Affiliates only through an Affiliate Network, then Stipulating Defendants shall contractually require that the Affiliate Network provide the information required by this Subsection to each of those Affiliates and retain proof of the same prior to any such Affiliate being used in any Stipulating Defendant's Affiliate Program; and if Stipulating Defendants should acquire an entity that has an existing program of

selling through Affiliates, the entity must complete all steps in this Subsection prior to Stipulating Defendants' acquisition of the entity.

        3.    Require that each Affiliate or Affiliate Network, prior to the public use or dissemination to consumers of any marketing materials, including, but not limited to, websites, emails, and pop-ups used by any Affiliate or Affiliate Network to advertise, promote, market, offer for sale, or sell any goods or services, provide Stipulating Defendants with the following information: (a) copies of all materially different marketing materials to be used by the Affiliate or Affiliate Network, including text, graphics, video, audio, and photographs; (b) each location the Affiliate or Affiliate Network maintains, or directly or indirectly controls, where the marketing materials will appear, including the URL of any website; and (c) for hyperlinks contained within the marketing materials, each location to which a consumer will be transferred by clicking on the hyperlink, including the URL of any website.  Stipulating Defendants shall also require each Affiliate or Affiliate Network to maintain and provide to Stipulating Defendants upon request records of the dates when the marketing materials are publicly used or disseminated to consumers.  *Provided, however*, that if Stipulating Defendants have access to certain Affiliates only through an Affiliate Network, then Stipulating Defendants shall contractually require that the Affiliate Network obtain and maintain the same information set forth above from each of those Affiliates who are part of any

Stipulating Defendant's Affiliate Program prior to the public use or dissemination to consumers of any such marketing materials, and provide proof to such Stipulating Defendant of having obtained the same.

4. Promptly review the marketing materials specified in Section VI.B.3 above as necessary to ensure compliance with this Order. Stipulating Defendants shall also promptly take steps as necessary to ensure that the marketing materials provided to Stipulating Defendants under Section VI.B.3 above are the marketing materials publicly used or disseminated to consumers by the Affiliate or Affiliate Network. If a Stipulating Defendant determines that use of any marketing materials does not comply with this Order, such Stipulating Defendant shall inform the Affiliate or Affiliate Network in writing that approval to use such marketing materials is denied and shall not pay any amounts to the Affiliate or Affiliate Network for such marketing, including any payments for leads, "click-throughs," or sales resulting therefrom. *Provided, however*, that if Stipulating Defendants have access to certain Affiliates only through an Affiliate Network, then Stipulating Defendants shall contractually require that the Affiliate Network comply with the procedures set forth in this Subsection as to those Affiliates.

5. Promptly investigate any complaints that any Stipulating Defendant receives through any source to determine whether any Affiliate or Affiliate Network is engaging in acts or practices prohibited by this Order, either

directly or through any Affiliate that is part of any Stipulating Defendant's Affiliate Program.

6. Upon determining that any Affiliate or Affiliate Network has engaged in, or is engaging in, acts or practices prohibited by this Order, either directly or through any Affiliate that is part of any Stipulating Defendant's Affiliate Program, immediately:

a. Disable any connection between the Stipulating Defendant's Affiliate Program and the marketing materials used by the Affiliate or Affiliate Network to engage in such acts or practices prohibited by this Order;

b. Halt all payments to the Affiliate or Affiliate Network resulting from such acts or practices prohibited by this Order; and

c. Terminate the Affiliate or Affiliate Network; *provided, however*, Stipulating Defendants shall not be in violation of this subsection if Stipulating Defendants fail to terminate an Affiliate Network in a case where Stipulating Defendants' only access to an Affiliate who has engaged in acts or practices prohibited by this Order is through an Affiliate Network and Stipulating Defendants receive notice that the Affiliate Network immediately terminated the Affiliate violating this Order from any Affiliate Program maintained by any Stipulating Defendant.

# VII.

## PROHIBITIONS AGAINST
## COMMERCIAL EMAIL MISREPRESENATIONS

**IT IS FURTHER ORDERED** that Stipulating Defendants, Stipulating Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promotion, offering for sale, or sale of any product, service, or program, are permanently restrained and enjoined from violating Sections 5 and 6 of the CAN-SPAM Act, 15 U.S.C. §§ 7704 and 7705, of which a copy of the CAN-SPAM Act, 15 U.S.C. §§ 7701-7713, is attached and herein incorporated, by, including but not limited to, initiating, procuring, or transmitting, or assisting others in initiating, procuring, or transmitting, a commercial electronic mail message that:

A.    Contains, or is accompanied by, materially false or materially misleading header information, including but not limited to:

1.    an originating electronic mail address, domain name, or Internet Protocol address when the access to such originating electronic email address, domain name or Internet Protocol address was obtained by means of false or fraudulent pretenses or representations;

2.       a "from" line (the line identifying or purporting to identify the person initiating the message) that does not accurately identify any person who initiated the message; or

3.       fails to identify accurately a protected computer used to initiate the message;

B.       Contains a subject heading likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message;

C.       Does not include a clear and conspicuous notice of the recipient's opportunity to decline to receive further commercial electronic mail messages from the sender at the recipient's electronic mail address and describes the means by which the recipient can decline to receive future commercial email messages from the sender;

D.       Does not include a functioning return electronic mail address or other Internet-based mechanism, clearly and conspicuously displayed, that a recipient can use to submit a reply electronic mail message or other form of Internet-based communication requesting not to receive future commercial electronic mail messages from the sender at the electronic mail address where the message was received, and that remains capable of receiving such messages or communications for no less than 30 days after the transmission of the original message;

E.      Does not include the sender's valid physical postal address; or

F.      Is sent to a recipient's email address, more than 10 business days after the sender receives a request from that email recipient not to receive future commercial electronic mail messages from the sender at the recipient's electronic mail address.

## VIII.

## MONETARY JUDGMENT

**IT IS FURTHER ORDERED** that:

A.      Judgment in the amount of Forty-Three Million, Three Hundred Seventy-Nine Thousand, Two Hundred Fifty-Three Dollars and Fifty Cents ($43,379,253.50) is entered in favor of the Commission against Stipulating Individual Defendants and Stipulating Corporate Defendants, jointly and severally, as equitable monetary relief.

B.      Within seven (7) days of the date of entry of this Order, Stipulating Corporate Defendant Optim Products LLC is ordered to take all steps that the Receiver may require, including executing any documents and providing any necessary information, to cause the transfer to the Receiver, or to his qualified settlement fund, possession and legal and equitable title to the interests in the real property described in paragraph A of Attachment A to this Order (collectively, the "Optim Real Property interests").  Following the transfer of title, Defendant Optim

Products LLC expressly waives, releases, discharges, and disclaims all right, title, and interest in the Optim Real Property interests described in this sub-paragraph. Until Defendant Optim Products LLC transfers title and possession of the Optim Real Property interests to the Receiver, Defendant Optim Products LLC shall maintain and take no action to diminish the value of the Optim Real Property interests.

C.     Within seven (7) days of the date of entry of this Order, Stipulating Individual Defendant Edgar Babayan is ordered to take all steps that the Receiver may require, including executing any documents and providing any necessary information, to cause the transfer to the Receiver, or to his qualified settlement fund, possession and legal and equitable title to the interests in the real property described in paragraph B of Attachment A to this Order (collectively, the "Edgar Babayan Real Property").  Following transfer of title and possession, the Receiver shall be responsible for all maintenance, utilities, taxes, homeowner's association fees, and all other expenses of any nature related to the Edgar Babayan Real Property.  Edgar Babayan represents that no encumbrances to the Edgar Babayan Real Property have been added since the execution of his sworn financial statement dated December 4, 2015, and that he will not add any encumbrances or liens to the Edgar Babayan Real Property after signing this Order.  The costs and expenses of transferring the Edgar Babayan Real Property shall be paid by the Receivership.

Edgar Babayan expressly agrees that none of the Edgar Babayan Real Property is a homestead property, and further hereby forever waives, releases, discharges, and disclaims all right, title, and interest in the Edgar Babayan Real Property described in this sub-paragraph. Until Edgar Babayan transfers title and possession of the Edgar Babayan Real Property, he shall maintain and take no action to diminish the value of the Edgar Babayan Real Property, including any structures, fixtures, and appurtenances thereto, in the same condition as on the date Edgar Babayan executed his sworn financial statement dated December 4, 2015. Until Edgar Babayan transfers title and possession of the Edgar Babayan Real Property to the Receiver, Edgar Babayan shall remain current on all amounts due and payable on the Edgar Babayan Real Property, including but not limited to tax, insurance, homeowner's assessments, reasonable and necessary maintenance, and similar fees. In order to transfer possession of the Edgar Babayan Real Property, Edgar Babayan shall vacate the Edgar Babayan Real Property in "broom clean condition," and deliver all keys and security codes, if any, to the Receiver along with written notice that possession is surrendered.

D.     Within seven (7) days of the date of entry of this Order, Stipulating Individual Defendant Artur Babayan is ordered to take all steps that the Receiver may require, including executing any documents and providing any necessary information, to cause the transfer to the Receiver, or to his qualified settlement

fund, possession and legal and equitable title to the interests in the real property described in paragraph C of Attachment A to this Order (the "Artur Babayan Real Property"). Following transfer of title and possession, the Receiver shall be responsible for all maintenance, utilities, taxes, homeowner's association fees, and all other expenses of any nature related to the Artur Babayan Real Property. Artur Babayan represents that no encumbrances to the Artur Babayan Real Property have been added since the execution of his sworn financial statement dated May 8, 2015, and that that he will not add any encumbrances or liens to the Artur Babayan Real Property after signing this Order. The costs and expenses of transferring the Artur Babayan Real Property shall be paid by the Receivership. Artur Babayan expressly agrees that none of the Artur Babayan Real Property is a homestead property, and further hereby forever waives, releases, discharges, and disclaims all right, title, and interest in the Artur Babayan Real Property described in this sub-paragraph. Until Artur Babayan transfers title and possession of the Artur Babayan Real Property, he shall maintain and take no action to diminish the value of the Artur Babayan Real Property, including any structures, fixtures, and appurtenances thereto, in the same condition as on the date Artur Babayan executed his sworn financial statement dated December 4, 2015. Until Artur Babayan transfers title and possession of the Artur Babayan Real Property to the Receiver, Artur Babayan shall remain current on all amounts due and payable on the Artur Babayan Real

Property, including but not limited to tax, insurance, homeowner's assessments, reasonable and necessary maintenance, and similar fees. In order to transfer possession of the Artur Babayan Real Property, Artur Babayan shall vacate the Artur Babayan Real Property in "broom clean condition," and deliver all keys and security codes, if any, to the Receiver along with written notice that possession is surrendered.

      E.    Within seven (7) days of the date of entry of this Order, Stipulating Individual Defendant Vahe Haroutounian is ordered to take all steps that the Receiver may require, including executing any documents and providing any necessary information, to cause the transfer to the Receiver, or to his qualified settlement fund, possession and legal and equitable title to the interests in the real property described in paragraph D of Attachment A to this Order (the "Haroutounian Real Property"). Following transfer of title and possession, the Receiver shall be responsible for all maintenance, utilities, taxes, homeowner's association fees, and all other expenses of any nature related to the Haroutounian Real Property. Vahe Haroutounian represents that no encumbrances to the Vahe Haroutounian Real Property have been added since the execution of his sworn financial statement dated May 8, 2015, and that he will not add any encumbrances or liens to the Haroutounian Real Property after signing this Order. The costs and expenses of transferring the Haroutounian Real Property shall be paid by the

Receivership. Haroutounian expressly agrees that the Haroutounian Real Property is not a homestead property, and further hereby forever waives, releases, discharges, and disclaims all right, title, and interest in the Haroutounian Real Property described in this sub-paragraph. Until Vahe Haroutounian transfers title and possession of the Haroutounian Real Property, he shall maintain and take no action to diminish the value of the Haroutounian Real Property, including any structures, fixtures, and appurtenances thereto, in the same condition as on the date Vahe Haroutounian executed his sworn financial statement dated May 8, 2015. Until Vahe Haroutounian transfers title and possession of the Haroutounian Real Property to the Receiver, Vahe Haroutounian shall remain current on all amounts due and payable on the Haroutounian Real Property, including but not limited to tax, insurance, homeowner's assessments, reasonable and necessary maintenance, and similar fees. In order to transfer possession of the Haroutounian Real Property, Vahe Haroutounian shall vacate the Haroutounian Real Property in "broom clean condition," and deliver all keys and security codes, if any, to the Receiver along with written notice that possession is surrendered.

F. Within seven (7) days of the date of entry of this Order, Defendant Vahe Haroutounian is ordered to transfer any and all ownership interest he has in the real property described in paragraph E of Attachment A to this Order, to his parents, Rafik Haroutounian and Ilda Avasapian (the "Haroutounian Family Real

Property"). Defendant Vahe Haroutounian shall provide written proof of such transfer, in a form acceptable to the Commission, within five (5) days of the transfer. Defendant Vahe Haroutounian shall receive no consideration, cash or otherwise, for the transfer of title to his parents.

G. Upon the asset transfers specified in Subsections VIII.B-F and Section IX, the remainder of the judgment is suspended, subject to the Subsections below.

H. The Commission's agreement to the suspension of part of the judgment is expressly premised upon the truthfulness, accuracy, and completeness of Stipulating Defendants' sworn financial statements and related documents (collectively, "financial representations") submitted to the Commission, namely:

1. the Financial Statement of Individual Defendant Edgar Babayan signed on December 4, 2015, including the attachments;

2. the Financial Statement of Individual Defendant Artur Babayan signed on May 8, 2015, including the attachments;

3. the Financial Statement of Individual Defendant Vahe Haroutounian signed on May 8, 2015, including the attachments;

4. the Financial Statement of Corporate Defendant Sale Slash, LLC signed by Artur Babayan, President on May 13, 2015, including the attachments;

5. the Financial Statement of Corporate Defendant Purists Choice LLC, signed by Artur Babayan, President, on May 13, 2015, including the attachments; and

6. the Financial Statement of Corporate Defendant Optim Products LLC, signed by Vahe Haroutounian, Owner, on December 2, 2015, including the attachments.

I. The suspension of the judgment will be lifted as to any Stipulating Defendant if, upon motion by the Commission, the Court finds that Stipulating Defendant failed to disclose any material asset, materially misstated the value of any asset, or made any other material misstatement or omission in the financial representations identified above.

J. If the suspension of the judgment is lifted, the judgment becomes immediately due as to that Stipulating Defendant in the amount specified in Subsection A. above (which the parties stipulate only for purposes of this Section represents the consumer injury alleged in the Complaint), less any payment previously made pursuant to this Section, plus interest computed from the date of entry of this Order.

K. Stipulating Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

L.      The facts alleged in the Complaint will be taken as true, without

further proof, in any subsequent civil litigation by or on behalf of the Commission,

including in a proceeding to enforce its rights to any payment or monetary

judgment pursuant to this Order, such as a nondischargeability complaint in any

bankruptcy case.

M.      The facts alleged in the Complaint establish all elements necessary to

sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the

Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral

estoppel effect for such purposes.

N.      Stipulating Defendants acknowledge that their Taxpayer Identification

Numbers (Social Security Numbers or Employer Identification Numbers), which

Stipulating Defendants previously submitted to the Commission, may be used for

collecting and reporting on any delinquent amount arising out of this Order, in

accordance with 31 U.S.C. § 7701.

O.      All money paid to the Commission pursuant to this Order may be

deposited into a fund administered by the Commission or its designee to be used

for equitable relief, including consumer redress and any attendant expenses for the

administration of any redress fund.  If a representative of the Commission decides

that direct redress to consumers is wholly or partially impracticable or money

remains after redress is completed, the Commission may apply any remaining

money for such other equitable relief (including consumer information remedies) as it determines to be reasonably related to Stipulating Defendants' practices alleged in the Complaint. Any money not used for such equitable relief is to be deposited to the U.S. Treasury as disgorgement. Stipulating Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

P. The freeze on the assets of Stipulating Defendants Sale Slash, LLC, Purists Choice LLC, Artur Babayan, and Vahe Haroutounian pursuant to Section V of the Preliminary Injunction entered in this action on May 12, 2015 (the "First Preliminary Injunction") and the freeze of the assets of Stipulating Defendants Optim Products LLC and Edgar Babayan pursuant to Section V of the Preliminary Injunction as to Defendants Apex Customer Care LLC, Penway LLC, Renvee LLC, Optim Products LLC, and Edgar Babayan entered in this action on November 25, 2015 (the "Second Preliminary Injunction") are modified to permit the payments and other transfers of assets identified in this Section. Upon completion of all payment and other obligations identified in this Section and in Sections IX, the asset freezes are dissolved as to Stipulating Defendants. A financial institution shall be entitled to rely upon a letter from the Commission stating that the freeze on the Stipulating Defendants' assets has been lifted.

## IX.

## **TURNOVER OF ASSETS HELD BY THIRD PARTIES**

**IT IS FURTHER ORDERED** that, in order to partially satisfy the monetary judgment set forth in Section VIII above:

A.     Any financial institution, business entity, or person that holds, controls, or maintains custody of any account or asset of any Individual Defendant, or any account or asset held on behalf of, or for the benefit of, any Individual Defendant, or any account or asset of any Individual Defendant frozen pursuant to (a) the TRO, (b) the First Preliminary Injunction; or (c) the Second Preliminary Injunction, shall turn over such account or asset to Plaintiff, by wire transfer pursuant to directions provided by counsel for the Commission, or as otherwise agreed to in writing by counsel for the Commission, within ten (10) days of receiving notice of this Order by any means, including, but not limited to, via facsimile.

B.     Any financial institution, business entity or person that holds, controls, or maintains custody of (1) any account or asset of any Receivership Defendant other than Defendants Apex Customer Care LLC, Penway LLC, and Renvee LLC, or (2) any account or asset held on behalf of, or for the benefit of, any Receivership Defendant other than Defendants Apex Customer Care LLC, Penway LLC, and Renvee LLC, or (3) any account or asset of any Receivership

Defendant other than Defendants Apex Customer Care LLC, Penway LLC, and Renvee LLC frozen pursuant to (a) the TRO, (b) the First Preliminary Injunction; or (c) the Second Preliminary Injunction, shall turn over such account or asset to the Receiver or her designated agent, by wire transfer pursuant to directions provided by the Receiver or her designated agent, or as otherwise agreed to in writing by the Receiver or her designated agent, within ten (10) days of receiving notice of this Order by any means, including, but not limited to, via facsimile. Upon such transfer, such account or asset shall be an account or asset of the receivership estate.

## X.

## CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that Stipulating Defendants, Stipulating Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from directly or indirectly:

A.    failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress. If a representative of the Commission requests in writing any information related to redress, Stipulating

Defendants must provide it, in the form prescribed by the Commission, within 14 days.

B.      disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account),  that any Defendant obtained prior to entry of this Order in connection with the sale or marketing of weight-loss products;  and

C.      failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after receipt of written direction to do so from a representative of the Commission.

*Provided, however*, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

## XI.

## COOPERATION

IT IS FURTHER ORDERED that Stipulating Defendants must fully cooperate with representatives of the Commission in this case and in any investigation related to or associated with the transactions or the occurrences that are the subject of the Complaint.  Stipulating Defendants must provide truthful and

complete information, evidence, and testimony. Stipulating Individual Defendants must appear and Stipulating Corporate Defendants must cause Stipulating Defendants' officers, employees, representatives, or agents to appear for interviews, discovery, hearings, trials, and any other proceedings that a Commission representative may reasonably request upon 5 days written notice, or other reasonable notice, at such places and times as a Commission representative may designate, without the service of a subpoena.

## XII.

## RECEIVERSHIP TERMINATION

**IT IS FURTHER ORDERED** that the appointment of the Receiver over Receivership Defendants pursuant to Section X of the Preliminary Injunction is hereby continued as modified by this Section.

A. Within seven (7) days aft er entry of this Order, the Receiver shall transfer the sum of Five Million Dollars ($5,000,000.00) to the Plaintiff from the funds previously transferred in this matter pursuant to (1) the TRO, (2) the First Preliminary Injunction, and (3) the Second Preliminary Injunction, by wire transfer pursuant to directions provided by counsel for the Commission, or as otherwise agreed to in writing by counsel for the Commission.

B.     The Receiver is directed and authorized to accomplish the following

within ninety (90) days after entry of this Order, but any party or the Receiver may

request that the Court extend the Receiver's term for good cause:

1.     Complete the process of taking custody, control, and possession

of all assets of Receivership Defendants, pursuant to Section X.B. of the

Preliminary Injunction;

2.     Negotiate and make payment necessary to resolve amounts

owed to American Express Bank, FSB related to the following credit card

accounts:

a.     accounts in the names of Optim Products LLC and Vaheh

Haroutounian, with number ending -1004;

b.     accounts in the names of Optim Products LLC and Vaheh

Haroutounian, with number ending -2002;

c.     accounts in the names of Sale Slash LLC and Artur

Babayan, with number ending -91005; and

d.     accounts in the names of e-Level Marketing Inc. and

Edgar Babayan, with number ending -51003.

3.     Complete the liquidation of (a) all assets of Receivership

Defendants, except for the assets of Receivership Defendants Apex Customer Care

LLC, Penway LLC, and Renvee LLC, and (b) all assets described in Section

VIII.B-F and Section IX.B, above, without further order of the Court . For purposes of liquidation of the assets described in Section VIII.B-F and Section IX.B, the Receiver shall obtain the appraisal of one disinterested person of the value of the asset before liquidating it;

      4.    Prepare and submit a report describing the Receiver's activities pursuant to this Order, and a final application for compensation and expenses; and

      5.    Distribute to Plaintiff any remaining liquid assets at the conclusion of the Receiver's duties.

    C.    Upon completion of the above tasks, the duties of the receivership as to the Receivership Defendants shall terminate, except as to the assets of Receivership Defendants Apex Customer Care LLC, Penway LLC, and Renvee LLC.

## XIII.

## <u>COOPERATION WITH THE RECEIVER</u>

    **IT IS FURTHER ORDERED** that Stipulating Defendants, Stipulating Defendants' officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, shall fully cooperate with and assist the Receiver. This cooperation and assistance shall include, but not be limited to providing any information to the Receiver that is reasonably necessary to

enable the Receiver to exercise its authority and discharge its responsibilities under this Order.

## XIV.

## ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Stipulating Defendants obtain acknowledgments of receipt of this Order:

A.    Each Stipulating Defendant , within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.    For 5 years  after entry of this Order, each Stipulating Individual Defendant for any business that such Defendant, individually or collectively with any other Defendant, is the majority owner or controls directly or indirectly, and each Stipulating Corporate Defendant, must deliver a copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2) all employees, agents, and representatives who participate in conduct related to the subject matter of the Order;  and  (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.     From each individual or entity to which a Stipulating Defendant

delivered a copy of this Order, that Stipulating Defendant must obtain, within 30

days, a signed and dated acknowledgment of receipt of this Order.

## XV.

## <u>COMPLIANCE REPORTING</u>

IT IS FURTHER ORDERED that Stipulating Defendants make timely

submissions to the Commission:

A.     One year after entry of this Order, each Stipulating Defendant must

submit a compliance report, sworn under penalty of perjury:

1.     Each Stipulating Defendant must:  (a) identify the primary

physical, postal, and email address and telephone number, as designated points of

contact, which representatives of the Commission may use to communicate with

Stipulating Defendant; (b) identify all of that Stipulating Defendant's businesses

by all of their names, telephone numbers, and physical, postal, email, and Internet

addresses; (c) describe the activities of each business, including the goods and

services offered, the means of advertising, marketing, and sales, and the

involvement of any other Defendant (which Stipulating Individual Defendants

must describe if they know or should know due to their own involvement); (d)

describe in detail whether and how that Stipulating Defendant is in compliance

with each Section of this Order; and (e) provide a copy of each Order

Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

2.     Additionally, each Stipulating Individual Defendant must:  (a) identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest; and (c) describe in detail such Defendant's involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B.     For 20 years after entry of this Order, each Stipulating Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.     Each Stipulating Defendant must report any change in:  (a) any designated point of contact; or (b) the structure of any Stipulating Corporate Defendant or any entity that Stipulating Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

2.     Additionally, each Stipulating Individual Defendant must report any change in:  (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which such Defendant performs services whether as an employee or otherwise and any entity in which such Defendant has any ownership interest,  and identify the name, physical address, and any Internet address of the business or entity.

C.     Each Stipulating Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Stipulating Defendant within 14 days of its filing.

D.     Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on:  _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.     Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal

Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: *FTC v. Sale Slash, LLC*, X150034.

## XVI.

## <u>RECORDKEEPING</u>

**IT IS FURTHER ORDERED** that Stipulating Defendants must create certain records for 20 years after entry of the Order, and retain each such record for 5 years. Specifically, Stipulating Corporate Defendants and each Stipulating Individual Defendant for any business that such Defendant, individually or collectively with any other Defendant, is a majority owner or controls directly or indirectly, must create and retain the following records:

A.     accounting records showing the revenues from all goods or services sold;

B.     personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.     records relating to Affiliates or Affiliate Networks, including all names, addresses, and telephone numbers; dollar amounts paid or received; and information used in calculating such payments;

D. records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

E. all records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission;

F. Copies of all marketing materials, documents, and information received pursuant to Subsection VI.B.3 of this Order; and all written approvals or denials of marketing materials made pursuant to Subsection VI.B.4 of this Order.

G. a copy of each unique advertisement or other marketing material.

## XVII.

## COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Stipulating Defendants' compliance with this Order, including the financial representations upon which part of the judgment was suspended and any failure to transfer any assets as required by this Order:

A. Within 14 days of receipt of a written request from a representative of the Commission, each Stipulating Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil

Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.  For matters concerning this Order, the Commission is authorized to communicate directly with each Stipulating Defendant.  Stipulating Defendants must permit representatives of the Commission to interview any employee or other person affiliated with any Stipulating Defendant who has agreed to such an interview.  The person interviewed may have counsel present.

C.  The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Stipulating Defendants or any individual or entity affiliated with Stipulating Defendants, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

D.  Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Individual Defendants, pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. §1681b(a)(1).

# XVIII.

## RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this

matter for purposes of construction, modification, and enforcement of this Order.


**IT IS SO ORDERED**, this _2nd_____ day of  Feb.    2016.

Hon. Percy Anderson
United States District Judge

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:**

Date: 2/1/2016

Matthew H. Wernz, Attorney
Federal Trade Commission, Midwest Region
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
Telephone: (312) 960-5596
Facsimile: (312) 960-5600
mwernz@ftc.gov

**FOR STIPULATING DEFENDANTS:**

Date: 12-15-15

Karl S. Kronenberger, CA # 226112
Virginia Sanderson, CA # 240241
Kronenberger Rosenfeld, LLP
150 Post Street, Suite 520
San Francisco, California 94108
Telephone: (415) 955-1155 Ext. 114
karl@krinternetlaw.com
ginny@krinternetlaw.com
*Attorney for Stipulating Defendants Sale Slash, LLC, Purists Choice LLC, Optim Products LLC, Edgar Babayan, Artur Babayan, and Vahe Haroutounian*

STIPULATING DEFENDANTS:

Date: 12-15-15

Sale Slash, LLC
by Artur Babayan, President

Date: 12-15-15

Purists Choice LLC
by Artur Babayan, President

Page 51 of 56

1
2                                                            Date: 12 -16 -15
3    Optim Products LLC
4    by Vahe Haroutounian, Owner
5
6                                                            Date: 12-16-15
7    Edgar Babayan
8
9                                                            Date: 12 -15 - 15
     Artur Babayan
10
11                                                           Date: 12 -16 - 15
12   Vahe Haroutounian
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                              Page 52 of 56

JONATHAN E. NUECHTERLEIN
GENERAL COUNSEL

MATTHEW H. WERNZ
GUY G. WARD
mwernz@ftc.gov
gward@ftc.gov
Federal Trade Commission
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
Tel: (312) 960-5596; Fax: (312) 960-5600

RAYMOND E. MCKOWN (Cal. Bar No. 150975)
rmckown@ftc.gov
Federal Trade Commission
10877 Wilshire Boulevard, Suite 700
Los Angeles, California 90024
Tel: (310) 824-4343; Fax: (310) 824-4380

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>  Plaintiff,<br><br>  v.<br><br>SALE SLASH, LLC, a California limited liability company, *et al.*,<br><br>  Defendants. | Case No. CV15-03107 PA (AJWx)<br><br>Schedule A to Stipulated Permanent Injunction and Monetary Judgment |

The following are the property descriptions referred to in Section VIII (Monetary Judgment) of the Stipulated Permanent Injunction and Monetary Judgment:

A.     The Optim Real Property Interests  referred to in Section VIII.B includes the following interests:

1.     any interest in the property located at 5850 East Grove Avenue, Fresno, California, 93612, including a Promissory Note and Deed of Trust with Absolute Assignment of Leases and Rents, Security Agreement, and Fixture Filing (First Priority), both dated July 10, 2014;

2.     any interest in the property located at 222 Monterey Road #1405, Glendale, California 91206, including a Promissory Note, dated July 7, 2014, and Deed of Trust with Absolute Assignment of Leases and Rents, Security Agreement, and Fixture Filing (First Priority), dated July 10, 2014;

3.     any interest in the property located at 3352 Brandon Street, Pasadena, California 91107, including a Promissory Note and Deed of Trust with Absolute Assignment of Leases and Rents, Security Agreement, and Fixture Filing (First Priority), both dated September 25, 2014; and

4.     any interest in the property located at 915 North Santa Anita Avenue, Arcadia, California 91006, including a Promissory Note and Deed of

Trust with Absolute Assignment of Leases and Rents, Security Agreement, and Fixture Filing (First Priority), both dated February 24, 2015.

B.     The Edgar Babayan Real Property referred to in Section VIII.C includes any interests in the real property, together with the structures, improvements, appurtenances, hereditaments, and other rights appertaining or belonging thereto, situated at:

1.     13909 Yellowstone Drive, Frazier Park California 93225;

2.     180 Aspen Oak, Glendale, California 91202;

3.     4440 Sandy River, #43, Las Vegas, Nevada 89103;

4.     4579 Don Ricardo Drive, Los Angeles, California 90008; and

5.     14839 Sherman Way, Unit 3, Van Nuys, California 91405.

C.     The Artur Babayan Real Property referred to in Section VIII.D includes any interests in the real property, together with the structures, improvements, appurtenances, hereditaments, and other rights appertaining or belonging thereto, situated at he real property commonly known as 4440 Sandy River, #43, Las Vegas, Nevada 89103.

D.     The Vahe Haroutounian Real Property referred to in Section VIII.E includes the real property, together with the structures, improvements, appurtenances, hereditaments, and other rights appertaining or belonging thereto, situated at 343 Pioneer Drive, Unit PH3, Glendale, California 91203.

E.      The Haroutounian Family Real Property referred to in Section VIII.F

includes the real property, together with the structures, improvements,

appurtenances, hereditaments, and other rights appertaining or belonging thereto,

situated at 6614 Valmont Street, Valmont, California 91042.

Public Law 108–187
108th Congress

## An Act

To regulate interstate commerce by imposing limitations and penalties on the transmission of unsolicited commercial electronic mail via the Internet.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003", or the "CAN-SPAM Act of 2003".

**SEC. 2. CONGRESSIONAL FINDINGS AND POLICY.**

(a) FINDINGS.—The Congress finds the following:

(1) Electronic mail has become an extremely important and popular means of communication, relied on by millions of Americans on a daily basis for personal and commercial purposes. Its low cost and global reach make it extremely convenient and efficient, and offer unique opportunities for the development and growth of frictionless commerce.

(2) The convenience and efficiency of electronic mail are threatened by the extremely rapid growth in the volume of unsolicited commercial electronic mail. Unsolicited commercial electronic mail is currently estimated to account for over half of all electronic mail traffic, up from an estimated 7 percent in 2001, and the volume continues to rise. Most of these messages are fraudulent or deceptive in one or more respects.

(3) The receipt of unsolicited commercial electronic mail may result in costs to recipients who cannot refuse to accept such mail and who incur costs for the storage of such mail, or for the time spent accessing, reviewing, and discarding such mail, or for both.

(4) The receipt of a large number of unwanted messages also decreases the convenience of electronic mail and creates a risk that wanted electronic mail messages, both commercial and noncommercial, will be lost, overlooked, or discarded amidst the larger volume of unwanted messages, thus reducing the reliability and usefulness of electronic mail to the recipient.

(5) Some commercial electronic mail contains material that many recipients may consider vulgar or pornographic in nature.

(6) The growth in unsolicited commercial electronic mail imposes significant monetary costs on providers of Internet access services, businesses, and educational and nonprofit institutions that carry and receive such mail, as there is a finite volume of mail that such providers, businesses, and

*Dec. 16, 2003*

[S. 877]

Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003.
15 USC 7701 note.

15 USC 7701.

PUBLIC LAW 108–187—DEC. 16, 2003

institutions can handle without further investment in infra-structure.

(7) Many senders of unsolicited commercial electronic mail purposefully disguise the source of such mail.

(8) Many senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages.

(9) While some senders of commercial electronic mail mes-sages provide simple and reliable ways for recipients to reject (or "opt-out" of) receipt of commercial electronic mail from such senders in the future, other senders provide no such "opt-out" mechanism, or refuse to honor the requests of recipi-ents not to receive electronic mail from such senders in the future, or both.

(10) Many senders of bulk unsolicited commercial electronic mail use computer programs to gather large numbers of elec-tronic mail addresses on an automated basis from Internet websites or online services where users must post their addresses in order to make full use of the website or service.

(11) Many States have enacted legislation intended to regu-late or reduce unsolicited commercial electronic mail, but these statutes impose different standards and requirements. As a result, they do not appear to have been successful in addressing the problems associated with unsolicited commercial electronic mail, in part because, since an electronic mail address does not specify a geographic location, it can be extremely difficult for law-abiding businesses to know with which of these dis-parate statutes they are required to comply.

(12) The problems associated with the rapid growth and abuse of unsolicited commercial electronic mail cannot be solved by Federal legislation alone. The development and adoption of technological approaches and the pursuit of cooperative efforts with other countries will be necessary as well.

(b) CONGRESSIONAL DETERMINATION OF PUBLIC POLICY.—On the basis of the findings in subsection (a), the Congress determines that—

(1) there is a substantial government interest in regulation of commercial electronic mail on a nationwide basis;

(2) senders of commercial electronic mail should not mis-lead recipients as to the source or content of such mail; and

(3) recipients of commercial electronic mail have a right to decline to receive additional commercial electronic mail from the same source.

15 USC 7702.     **SEC. 3. DEFINITIONS.**

In this Act:

(1) AFFIRMATIVE CONSENT.—The term "affirmative con-sent", when used with respect to a commercial electronic mail message, means that—

(A) the recipient expressly consented to receive the message, either in response to a clear and conspicuous request for such consent or at the recipient's own initiative; and

(B) if the message is from a party other than the party to which the recipient communicated such consent, the recipient was given clear and conspicuous notice at

PUBLIC LAW 108–187—DEC. 16, 2003          117 STAT. 2701

the time the consent was communicated that the recipient's electronic mail address could be transferred to such other party for the purpose of initiating commercial electronic mail messages.

(2) COMMERCIAL ELECTRONIC MAIL MESSAGE.—

(A) IN GENERAL.—The term "commercial electronic mail message" means any electronic mail message the primary purpose of which is the commercial advertisement or promotion of a commercial product or service (including content on an Internet website operated for a commercial purpose).

(B) TRANSACTIONAL OR RELATIONSHIP MESSAGES.—The term "commercial electronic mail message" does not include a transactional or relationship message.

(C) REGULATIONS REGARDING PRIMARY PURPOSE.—Not later than 12 months after the date of the enactment of this Act, the Commission shall issue regulations pursuant to section 13 defining the relevant criteria to facilitate the determination of the primary purpose of an electronic mail message.

Deadline.

(D) REFERENCE TO COMPANY OR WEBSITE.—The inclusion of a reference to a commercial entity or a link to the website of a commercial entity in an electronic mail message does not, by itself, cause such message to be treated as a commercial electronic mail message for purposes of this Act if the contents or circumstances of the message indicate a primary purpose other than commercial advertisement or promotion of a commercial product or service.

(3) COMMISSION.—The term "Commission" means the Federal Trade Commission.

(4) DOMAIN NAME.—The term "domain name" means any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet.

(5) ELECTRONIC MAIL ADDRESS.—The term "electronic mail address" means a destination, commonly expressed as a string of characters, consisting of a unique user name or mailbox (commonly referred to as the "local part") and a reference to an Internet domain (commonly referred to as the "domain part"), whether or not displayed, to which an electronic mail message can be sent or delivered.

(6) ELECTRONIC MAIL MESSAGE.—The term "electronic mail message" means a message sent to a unique electronic mail address.

(7) FTC ACT.—The term "FTC Act" means the Federal Trade Commission Act (15 U.S.C. 41 et seq.).

(8) HEADER INFORMATION.—The term "header information" means the source, destination, and routing information attached to an electronic mail message, including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message.

(9) INITIATE.—The term "initiate", when used with respect to a commercial electronic mail message, means to originate or transmit such message or to procure the origination or

transmission of such message, but shall not include actions that constitute routine conveyance of such message. For purposes of this paragraph, more than one person may be considered to have initiated a message.

(10) INTERNET.—The term "Internet" has the meaning given that term in the Internet Tax Freedom Act (47 U.S.C. 151 nt).

(11) INTERNET ACCESS SERVICE.—The term "Internet access service" has the meaning given that term in section 231(e)(4) of the Communications Act of 1934 (47 U.S.C. 231(e)(4)).

(12) PROCURE.—The term "procure", when used with respect to the initiation of a commercial electronic mail message, means intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf.

(13) PROTECTED COMPUTER.—The term "protected computer" has the meaning given that term in section 1030(e)(2)(B) of title 18, United States Code.

(14) RECIPIENT.—The term "recipient", when used with respect to a commercial electronic mail message, means an authorized user of the electronic mail address to which the message was sent or delivered. If a recipient of a commercial electronic mail message has one or more electronic mail addresses in addition to the address to which the message was sent or delivered, the recipient shall be treated as a separate recipient with respect to each such address. If an electronic mail address is reassigned to a new user, the new user shall not be treated as a recipient of any commercial electronic mail message sent or delivered to that address before it was reassigned.

(15) ROUTINE CONVEYANCE.—The term "routine conveyance" means the transmission, routing, relaying, handling, or storing, through an automatic technical process, of an electronic mail message for which another person has identified the recipients or provided the recipient addresses.

(16) SENDER.—

(A) IN GENERAL.—Except as provided in subparagraph (B), the term "sender", when used with respect to a commercial electronic mail message, means a person who initiates such a message and whose product, service, or Internet web site is advertised or promoted by the message.

(B) SEPARATE LINES OF BUSINESS OR DIVISIONS.—If an entity operates through separate lines of business or divisions and holds itself out to the recipient throughout the message as that particular line of business or division rather than as the entity of which such line of business or division is a part, then the line of business or the division shall be treated as the sender of such message for purposes of this Act.

(17) TRANSACTIONAL OR RELATIONSHIP MESSAGE.—

(A) IN GENERAL.—The term "transactional or relationship message" means an electronic mail message the primary purpose of which is—

(i) to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender;

(ii) to provide warranty information, product recall information, or safety or security information with respect to a commercial product or service used or purchased by the recipient;

(iii) to provide—

(I) notification concerning a change in the terms or features of;

(II) notification of a change in the recipient's standing or status with respect to; or

(III) at regular periodic intervals, account balance information or other type of account statement with respect to,

a subscription, membership, account, loan, or comparable ongoing commercial relationship involving the ongoing purchase or use by the recipient of products or services offered by the sender;

(iv) to provide information directly related to an employment relationship or related benefit plan in which the recipient is currently involved, participating, or enrolled; or

(v) to deliver goods or services, including product updates or upgrades, that the recipient is entitled to receive under the terms of a transaction that the recipient has previously agreed to enter into with the sender.

(B) MODIFICATION OF DEFINITION.—The Commission by regulation pursuant to section 13 may modify the definition in subparagraph (A) to expand or contract the categories of messages that are treated as transactional or relationship messages for purposes of this Act to the extent that such modification is necessary to accommodate changes in electronic mail technology or practices and accomplish the purposes of this Act.

**SEC. 4. PROHIBITION AGAINST PREDATORY AND ABUSIVE COMMERCIAL E-MAIL.**

15 USC 7703.

(a) OFFENSE.—

(1) IN GENERAL.—Chapter 47 of title 18, United States Code, is amended by adding at the end the following new section:

## "§ 1037. Fraud and related activity in connection with electronic mail

"(a) IN GENERAL.—Whoever, in or affecting interstate or foreign commerce, knowingly—

"(1) accesses a protected computer without authorization, and intentionally initiates the transmission of multiple commercial electronic mail messages from or through such computer,

"(2) uses a protected computer to relay or retransmit multiple commercial electronic mail messages, with the intent to deceive or mislead recipients, or any Internet access service, as to the origin of such messages,

"(3) materially falsifies header information in multiple commercial electronic mail messages and intentionally initiates the transmission of such messages,

"(4) registers, using information that materially falsifies the identity of the actual registrant, for five or more electronic

mail accounts or online user accounts or two or more domain names, and intentionally initiates the transmission of multiple commercial electronic mail messages from any combination of such accounts or domain names, or

"(5) falsely represents oneself to be the registrant or the legitimate successor in interest to the registrant of 5 or more Internet Protocol addresses, and intentionally initiates the transmission of multiple commercial electronic mail messages from such addresses,

or conspires to do so, shall be punished as provided in subsection (b).

"(b) PENALTIES.—The punishment for an offense under subsection (a) is—

"(1) a fine under this title, imprisonment for not more than 5 years, or both, if—

"(A) the offense is committed in furtherance of any felony under the laws of the United States or of any State; or

"(B) the defendant has previously been convicted under this section or section 1030, or under the law of any State for conduct involving the transmission of multiple commercial electronic mail messages or unauthorized access to a computer system;

"(2) a fine under this title, imprisonment for not more than 3 years, or both, if—

"(A) the offense is an offense under subsection (a)(1);

"(B) the offense is an offense under subsection (a)(4) and involved 20 or more falsified electronic mail or online user account registrations, or 10 or more falsified domain name registrations;

"(C) the volume of electronic mail messages transmitted in furtherance of the offense exceeded 2,500 during any 24-hour period, 25,000 during any 30-day period, or 250,000 during any 1-year period;

"(D) the offense caused loss to one or more persons aggregating $5,000 or more in value during any 1-year period;

"(E) as a result of the offense any individual committing the offense obtained anything of value aggregating $5,000 or more during any 1-year period; or

"(F) the offense was undertaken by the defendant in concert with three or more other persons with respect to whom the defendant occupied a position of organizer or leader; and

"(3) a fine under this title or imprisonment for not more than 1 year, or both, in any other case.

"(c) FORFEITURE.—

Courts.

"(1) IN GENERAL.—The court, in imposing sentence on a person who is convicted of an offense under this section, shall order that the defendant forfeit to the United States—

"(A) any property, real or personal, constituting or traceable to gross proceeds obtained from such offense; and

"(B) any equipment, software, or other technology used or intended to be used to commit or to facilitate the commission of such offense.

"(2) PROCEDURES.—The procedures set forth in section 413 of the Controlled Substances Act (21 U.S.C. 853), other than subsection (d) of that section, and in Rule 32.2 of the Federal Rules of Criminal Procedure, shall apply to all stages of a criminal forfeiture proceeding under this section.

Applicability.

"(d) DEFINITIONS.—In this section:

"(1) LOSS.—The term 'loss' has the meaning given that term in section 1030(e) of this title.

"(2) MATERIALLY.—For purposes of paragraphs (3) and (4) of subsection (a), header information or registration information is materially falsified if it is altered or concealed in a manner that would impair the ability of a recipient of the message, an Internet access service processing the message on behalf of a recipient, a person alleging a violation of this section, or a law enforcement agency to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation.

"(3) MULTIPLE.—The term 'multiple' means more than 100 electronic mail messages during a 24-hour period, more than 1,000 electronic mail messages during a 30-day period, or more than 10,000 electronic mail messages during a 1-year period.

"(4) OTHER TERMS.—Any other term has the meaning given that term by section 3 of the CAN-SPAM Act of 2003.".

(2) CONFORMING AMENDMENT.—The chapter analysis for chapter 47 of title 18, United States Code, is amended by adding at the end the following:

"Sec.
"1037. Fraud and related activity in connection with electronic mail.".

(b) UNITED STATES SENTENCING COMMISSION.—

28 USC 994 note.

(1) DIRECTIVE.—Pursuant to its authority under section 994(p) of title 28, United States Code, and in accordance with this section, the United States Sentencing Commission shall review and, as appropriate, amend the sentencing guidelines and policy statements to provide appropriate penalties for violations of section 1037 of title 18, United States Code, as added by this section, and other offenses that may be facilitated by the sending of large quantities of unsolicited electronic mail.

(2) REQUIREMENTS.—In carrying out this subsection, the Sentencing Commission shall consider providing sentencing enhancements for—

(A) those convicted under section 1037 of title 18, United States Code, who—

(i) obtained electronic mail addresses through improper means, including—

(I) harvesting electronic mail addresses of the users of a website, proprietary service, or other online public forum operated by another person, without the authorization of such person; and

(II) randomly generating electronic mail addresses by computer; or

(ii) knew that the commercial electronic mail messages involved in the offense contained or advertised an Internet domain for which the registrant of the domain had provided false registration information; and

(B) those convicted of other offenses, including offenses involving fraud, identity theft, obscenity, child pornography, and the sexual exploitation of children, if such offenses involved the sending of large quantities of electronic mail.

(c) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) Spam has become the method of choice for those who distribute pornography, perpetrate fraudulent schemes, and introduce viruses, worms, and Trojan horses into personal and business computer systems; and

(2) the Department of Justice should use all existing law enforcement tools to investigate and prosecute those who send bulk commercial e-mail to facilitate the commission of Federal crimes, including the tools contained in chapters 47 and 63 of title 18, United States Code (relating to fraud and false statements); chapter 71 of title 18, United States Code (relating to obscenity); chapter 110 of title 18, United States Code (relating to the sexual exploitation of children); and chapter 95 of title 18, United States Code (relating to racketeering), as appropriate.

15 USC 7704.

**SEC. 5. OTHER PROTECTIONS FOR USERS OF COMMERCIAL ELECTRONIC MAIL.**

(a) REQUIREMENTS FOR TRANSMISSION OF MESSAGES.—

(1) PROHIBITION OF FALSE OR MISLEADING TRANSMISSION INFORMATION.—It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transactional or relationship message, that contains, or is accompanied by, header information that is materially false or materially misleading. For purposes of this paragraph—

(A) header information that is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading;

(B) a "from" line (the line identifying or purporting to identify a person initiating the message) that accurately identifies any person who initiated the message shall not be considered materially false or materially misleading; and

(C) header information shall be considered materially misleading if it fails to identify accurately a protected computer used to initiate the message because the person initiating the message knowingly uses another protected computer to relay or retransmit the message for purposes of disguising its origin.

(2) PROHIBITION OF DECEPTIVE SUBJECT HEADINGS.—It is unlawful for any person to initiate the transmission to a protected computer of a commercial electronic mail message if such person has actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that a subject heading of the message would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact

regarding the contents or subject matter of the message (consistent with the criteria used in enforcement of section 5 of the Federal Trade Commission Act (15 U.S.C. 45)).

(3) INCLUSION OF RETURN ADDRESS OR COMPARABLE MECHANISM IN COMMERCIAL ELECTRONIC MAIL.—

(A) IN GENERAL.—It is unlawful for any person to initiate the transmission to a protected computer of a commercial electronic mail message that does not contain a functioning return electronic mail address or other Internet-based mechanism, clearly and conspicuously displayed, that—

(i) a recipient may use to submit, in a manner specified in the message, a reply electronic mail message or other form of Internet-based communication requesting not to receive future commercial electronic mail messages from that sender at the electronic mail address where the message was received; and

(ii) remains capable of receiving such messages or communications for no less than 30 days after the transmission of the original message.

(B) MORE DETAILED OPTIONS POSSIBLE.—The person initiating a commercial electronic mail message may comply with subparagraph (A)(i) by providing the recipient a list or menu from which the recipient may choose the specific types of commercial electronic mail messages the recipient wants to receive or does not want to receive from the sender, if the list or menu includes an option under which the recipient may choose not to receive any commercial electronic mail messages from the sender.

(C) TEMPORARY INABILITY TO RECEIVE MESSAGES OR PROCESS REQUESTS.—A return electronic mail address or other mechanism does not fail to satisfy the requirements of subparagraph (A) if it is unexpectedly and temporarily unable to receive messages or process requests due to a technical problem beyond the control of the sender if the problem is corrected within a reasonable time period.

(4) PROHIBITION OF TRANSMISSION OF COMMERCIAL ELECTRONIC MAIL AFTER OBJECTION.—

(A) IN GENERAL.—If a recipient makes a request using a mechanism provided pursuant to paragraph (3) not to receive some or any commercial electronic mail messages from such sender, then it is unlawful—

(i) for the sender to initiate the transmission to the recipient, more than 10 business days after the receipt of such request, of a commercial electronic mail message that falls within the scope of the request;

(ii) for any person acting on behalf of the sender to initiate the transmission to the recipient, more than 10 business days after the receipt of such request, of a commercial electronic mail message with actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that such message falls within the scope of the request;

(iii) for any person acting on behalf of the sender to assist in initiating the transmission to the recipient, through the provision or selection of addresses to which the message will be sent, of a commercial electronic

117 STAT. 2708 PUBLIC LAW 108–187—DEC. 16, 2003

mail message with actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that such message would violate clause (i) or (ii); or

(iv) for the sender, or any other person who knows that the recipient has made such a request, to sell, lease, exchange, or otherwise transfer or release the electronic mail address of the recipient (including through any transaction or other transfer involving mailing lists bearing the electronic mail address of the recipient) for any purpose other than compliance with this Act or other provision of law.

(B) SUBSEQUENT AFFIRMATIVE CONSENT.—A prohibition in subparagraph (A) does not apply if there is affirmative consent by the recipient subsequent to the request under subparagraph (A).

(5) INCLUSION OF IDENTIFIER, OPT-OUT, AND PHYSICAL ADDRESS IN COMMERCIAL ELECTRONIC MAIL.—(A) It is unlawful for any person to initiate the transmission of any commercial electronic mail message to a protected computer unless the message provides—

(i) clear and conspicuous identification that the message is an advertisement or solicitation;

(ii) clear and conspicuous notice of the opportunity under paragraph (3) to decline to receive further commercial electronic mail messages from the sender; and

(iii) a valid physical postal address of the sender.

(B) Subparagraph (A)(i) does not apply to the transmission of a commercial electronic mail message if the recipient has given prior affirmative consent to receipt of the message.

(6) MATERIALLY.—For purposes of paragraph (1), the term "materially", when used with respect to false or misleading header information, includes the alteration or concealment of header information in a manner that would impair the ability of an Internet access service processing the message on behalf of a recipient, a person alleging a violation of this section, or a law enforcement agency to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation, or the ability of a recipient of the message to respond to a person who initiated the electronic message.

(b) AGGRAVATED VIOLATIONS RELATING TO COMMERCIAL ELECTRONIC MAIL.—

(1) ADDRESS HARVESTING AND DICTIONARY ATTACKS.—

(A) IN GENERAL.—It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message that is unlawful under subsection (a), or to assist in the origination of such message through the provision or selection of addresses to which the message will be transmitted, if such person had actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that—

(i) the electronic mail address of the recipient was obtained using an automated means from an Internet website or proprietary online service operated by another person, and such website or online service included, at the time the address was obtained, a notice stating that the operator of such website or online

service will not give, sell, or otherwise transfer addresses maintained by such website or online service to any other party for the purposes of initiating, or enabling others to initiate, electronic mail messages; or

(ii) the electronic mail address of the recipient was obtained using an automated means that generates possible electronic mail addresses by combining names, letters, or numbers into numerous permutations.

(B) DISCLAIMER.—Nothing in this paragraph creates an ownership or proprietary interest in such electronic mail addresses.

(2) AUTOMATED CREATION OF MULTIPLE ELECTRONIC MAIL ACCOUNTS.—It is unlawful for any person to use scripts or other automated means to register for multiple electronic mail accounts or online user accounts from which to transmit to a protected computer, or enable another person to transmit to a protected computer, a commercial electronic mail message that is unlawful under subsection (a).

(3) RELAY OR RETRANSMISSION THROUGH UNAUTHORIZED ACCESS.—It is unlawful for any person knowingly to relay or retransmit a commercial electronic mail message that is unlawful under subsection (a) from a protected computer or computer network that such person has accessed without authorization.

(c) SUPPLEMENTARY RULEMAKING AUTHORITY.—The Commission shall by regulation, pursuant to section 13—

(1) modify the 10-business-day period under subsection (a)(4)(A) or subsection (a)(4)(B), or both, if the Commission determines that a different period would be more reasonable after taking into account—

(A) the purposes of subsection (a);

(B) the interests of recipients of commercial electronic mail; and

(C) the burdens imposed on senders of lawful commercial electronic mail; and

(2) specify additional activities or practices to which subsection (b) applies if the Commission determines that those activities or practices are contributing substantially to the proliferation of commercial electronic mail messages that are unlawful under subsection (a).

(d) REQUIREMENT TO PLACE WARNING LABELS ON COMMERCIAL ELECTRONIC MAIL CONTAINING SEXUALLY ORIENTED MATERIAL.—

(1) IN GENERAL.—No person may initiate in or affecting interstate commerce the transmission, to a protected computer, of any commercial electronic mail message that includes sexually oriented material and—

(A) fail to include in subject heading for the electronic mail message the marks or notices prescribed by the Commission under this subsection; or

(B) fail to provide that the matter in the message that is initially viewable to the recipient, when the message is opened by any recipient and absent any further actions by the recipient, includes only—

(i) to the extent required or authorized pursuant to paragraph (2), any such marks or notices;

PUBLIC LAW 108–187—DEC. 16, 2003

(ii) the information required to be included in the message pursuant to subsection (a)(5); and

(iii) instructions on how to access, or a mechanism to access, the sexually oriented material.

(2) PRIOR AFFIRMATIVE CONSENT.—Paragraph (1) does not apply to the transmission of an electronic mail message if the recipient has given prior affirmative consent to receipt of the message.

Deadline.

(3) PRESCRIPTION OF MARKS AND NOTICES.—Not later than 120 days after the date of the enactment of this Act, the Commission in consultation with the Attorney General shall prescribe clearly identifiable marks or notices to be included in or associated with commercial electronic mail that contains sexually oriented material, in order to inform the recipient of that fact and to facilitate filtering of such electronic mail.

Federal Register, publication.

The Commission shall publish in the Federal Register and provide notice to the public of the marks or notices prescribed under this paragraph.

(4) DEFINITION.—In this subsection, the term "sexually oriented material" means any material that depicts sexually explicit conduct (as that term is defined in section 2256 of title 18, United States Code), unless the depiction constitutes a small and insignificant part of the whole, the remainder of which is not primarily devoted to sexual matters.

(5) PENALTY.—Whoever knowingly violates paragraph (1) shall be fined under title 18, United States Code, or imprisoned not more than 5 years, or both.

15 USC 7705.

**SEC. 6. BUSINESSES KNOWINGLY PROMOTED BY ELECTRONIC MAIL WITH FALSE OR MISLEADING TRANSMISSION INFORMATION.**

(a) IN GENERAL.—It is unlawful for a person to promote, or allow the promotion of, that person's trade or business, or goods, products, property, or services sold, offered for sale, leased or offered for lease, or otherwise made available through that trade or business, in a commercial electronic mail message the transmission of which is in violation of section 5(a)(1) if that person—

(1) knows, or should have known in the ordinary course of that person's trade or business, that the goods, products, property, or services sold, offered for sale, leased or offered for lease, or otherwise made available through that trade or business were being promoted in such a message;

(2) received or expected to receive an economic benefit from such promotion; and

(3) took no reasonable action—

(A) to prevent the transmission; or

(B) to detect the transmission and report it to the Commission.

(b) LIMITED ENFORCEMENT AGAINST THIRD PARTIES.—

(1) IN GENERAL.—Except as provided in paragraph (2), a person (hereinafter referred to as the "third party") that provides goods, products, property, or services to another person that violates subsection (a) shall not be held liable for such violation.

(2) EXCEPTION.—Liability for a violation of subsection (a) shall be imputed to a third party that provides goods, products, property, or services to another person that violates subsection (a) if that third party—

(A) owns, or has a greater than 50 percent ownership or economic interest in, the trade or business of the person that violated subsection (a); or

(B)(i) has actual knowledge that goods, products, property, or services are promoted in a commercial electronic mail message the transmission of which is in violation of section 5(a)(1); and

(ii) receives, or expects to receive, an economic benefit from such promotion.

(c) EXCLUSIVE ENFORCEMENT BY FTC.—Subsections (f) and (g) of section 7 do not apply to violations of this section.

(d) SAVINGS PROVISION.—Except as provided in section 7(f)(8), nothing in this section may be construed to limit or prevent any action that may be taken under this Act with respect to any violation of any other section of this Act.

**SEC. 7. ENFORCEMENT GENERALLY.**                                    15 USC 7706.

(a) VIOLATION IS UNFAIR OR DECEPTIVE ACT OR PRACTICE.— Except as provided in subsection (b), this Act shall be enforced by the Commission as if the violation of this Act were an unfair or deceptive act or practice proscribed under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B)).

(b) ENFORCEMENT BY CERTAIN OTHER AGENCIES.—Compliance with this Act shall be enforced—

(1) under section 8 of the Federal Deposit Insurance Act (12 U.S.C. 1818), in the case of—

(A) national banks, and Federal branches and Federal agencies of foreign banks, by the Office of the Comptroller of the Currency;

(B) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agencies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, organizations operating under section 25 or 25A of the Federal Reserve Act (12 U.S.C. 601 and 611), and bank holding companies, by the Board;

(C) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System) and insured State branches of foreign banks, by the Board of Directors of the Federal Deposit Insurance Corporation; and

(D) savings associations the deposits of which are insured by the Federal Deposit Insurance Corporation, by the Director of the Office of Thrift Supervision;

(2) under the Federal Credit Union Act (12 U.S.C. 1751 et seq.) by the Board of the National Credit Union Administration with respect to any Federally insured credit union;

(3) under the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) by the Securities and Exchange Commission with respect to any broker or dealer;

(4) under the Investment Company Act of 1940 (15 U.S.C. 80a–1 et seq.) by the Securities and Exchange Commission with respect to investment companies;

(5) under the Investment Advisers Act of 1940 (15 U.S.C. 80b–1 et seq.) by the Securities and Exchange Commission with respect to investment advisers registered under that Act;

(6) under State insurance law in the case of any person engaged in providing insurance, by the applicable State insurance authority of the State in which the person is domiciled, subject to section 104 of the Gramm-Bliley-Leach Act (15 U.S.C. 6701), except that in any State in which the State insurance authority elects not to exercise this power, the enforcement authority pursuant to this Act shall be exercised by the Commission in accordance with subsection (a);

(7) under part A of subtitle VII of title 49, United States Code, by the Secretary of Transportation with respect to any air carrier or foreign air carrier subject to that part;

(8) under the Packers and Stockyards Act, 1921 (7 U.S.C. 181 et seq.) (except as provided in section 406 of that Act (7 U.S.C. 226, 227)), by the Secretary of Agriculture with respect to any activities subject to that Act;

(9) under the Farm Credit Act of 1971 (12 U.S.C. 2001 et seq.) by the Farm Credit Administration with respect to any Federal land bank, Federal land bank association, Federal intermediate credit bank, or production credit association; and

(10) under the Communications Act of 1934 (47 U.S.C. 151 et seq.) by the Federal Communications Commission with respect to any person subject to the provisions of that Act.

(c) EXERCISE OF CERTAIN POWERS.—For the purpose of the exercise by any agency referred to in subsection (b) of its powers under any Act referred to in that subsection, a violation of this Act is deemed to be a violation of a Federal Trade Commission trade regulation rule. In addition to its powers under any provision of law specifically referred to in subsection (b), each of the agencies referred to in that subsection may exercise, for the purpose of enforcing compliance with any requirement imposed under this Act, any other authority conferred on it by law.

(d) ACTIONS BY THE COMMISSION.—The Commission shall prevent any person from violating this Act in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated into and made a part of this Act. Any entity that violates any provision of that subtitle is subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act in the same manner, by the same means, and with the same jurisdiction, power, and duties as though all applicable terms and provisions of the Federal Trade Commission Act were incorporated into and made a part of that subtitle.

(e) AVAILABILITY OF CEASE-AND-DESIST ORDERS AND INJUNCTIVE RELIEF WITHOUT SHOWING OF KNOWLEDGE.—Notwithstanding any other provision of this Act, in any proceeding or action pursuant to subsection (a), (b), (c), or (d) of this section to enforce compliance, through an order to cease and desist or an injunction, with section 5(a)(1)(C), section 5(a)(2), clause (ii), (iii), or (iv) of section 5(a)(4)(A), section 5(b)(1)(A), or section 5(b)(3), neither the Commission nor the Federal Communications Commission shall be required to allege or prove the state of mind required by such section or subparagraph.

(f) ENFORCEMENT BY STATES.—

(1) CIVIL ACTION.—In any case in which the attorney general of a State, or an official or agency of a State, has reason to believe that an interest of the residents of that State has been or is threatened or adversely affected by any person who

violates paragraph (1) or (2) of section 5(a), who violates section 5(d), or who engages in a pattern or practice that violates paragraph (3), (4), or (5) of section 5(a), of this Act, the attorney general, official, or agency of the State, as parens patriae, may bring a civil action on behalf of the residents of the State in a district court of the United States of appropriate jurisdiction—

    (A) to enjoin further violation of section 5 of this Act by the defendant; or

    (B) to obtain damages on behalf of residents of the State, in an amount equal to the greater of—

        (i) the actual monetary loss suffered by such residents; or

        (ii) the amount determined under paragraph (3).

    (2) AVAILABILITY OF INJUNCTIVE RELIEF WITHOUT SHOWING OF KNOWLEDGE.—Notwithstanding any other provision of this Act, in a civil action under paragraph (1)(A) of this subsection, the attorney general, official, or agency of the State shall not be required to allege or prove the state of mind required by section 5(a)(1)(C), section 5(a)(2), clause (ii), (iii), or (iv) of section 5(a)(4)(A), section 5(b)(1)(A), or section 5(b)(3).

    (3) STATUTORY DAMAGES.—

    (A) IN GENERAL.—For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the amount calculated by multiplying the number of violations (with each separately addressed unlawful message received by or addressed to such residents treated as a separate violation) by up to $250.

    (B) LIMITATION.—For any violation of section 5 (other than section 5(a)(1)), the amount determined under subparagraph (A) may not exceed $2,000,000.

    (C) AGGRAVATED DAMAGES.—The court may increase a damage award to an amount equal to not more than three times the amount otherwise available under this paragraph if—

        (i) the court determines that the defendant committed the violation willfully and knowingly; or

        (ii) the defendant's unlawful activity included one or more of the aggravating violations set forth in section 5(b).

    (D) REDUCTION OF DAMAGES.—In assessing damages under subparagraph (A), the court may consider whether—

        (i) the defendant has established and implemented, with due care, commercially reasonable practices and procedures designed to effectively prevent such violations; or

        (ii) the violation occurred despite commercially reasonable efforts to maintain compliance the practices and procedures to which reference is made in clause (i).

    (4) ATTORNEY FEES.—In the case of any successful action under paragraph (1), the court, in its discretion, may award the costs of the action and reasonable attorney fees to the State.

    (5) RIGHTS OF FEDERAL REGULATORS.—The State shall serve prior written notice of any action under paragraph (1) upon

Notice.
Records.

the Federal Trade Commission or the appropriate Federal regulator determined under subsection (b) and provide the Commission or appropriate Federal regulator with a copy of its complaint, except in any case in which such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action. The Federal Trade Commission or appropriate Federal regulator shall have the right—

    (A) to intervene in the action;

    (B) upon so intervening, to be heard on all matters arising therein;

    (C) to remove the action to the appropriate United States district court; and

    (D) to file petitions for appeal.

    (6) CONSTRUCTION.—For purposes of bringing any civil action under paragraph (1), nothing in this Act shall be construed to prevent an attorney general of a State from exercising the powers conferred on the attorney general by the laws of that State to—

    (A) conduct investigations;

    (B) administer oaths or affirmations; or

    (C) compel the attendance of witnesses or the production of documentary and other evidence.

    (7) VENUE; SERVICE OF PROCESS.—

    (A) VENUE.—Any action brought under paragraph (1) may be brought in the district court of the United States that meets applicable requirements relating to venue under section 1391 of title 28, United States Code.

    (B) SERVICE OF PROCESS.—In an action brought under paragraph (1), process may be served in any district in which the defendant—

        (i) is an inhabitant; or

        (ii) maintains a physical place of business.

    (8) LIMITATION ON STATE ACTION WHILE FEDERAL ACTION IS PENDING.—If the Commission, or other appropriate Federal agency under subsection (b), has instituted a civil action or an administrative action for violation of this Act, no State attorney general, or official or agency of a State, may bring an action under this subsection during the pendency of that action against any defendant named in the complaint of the Commission or the other agency for any violation of this Act alleged in the complaint.

    (9) REQUISITE SCIENTER FOR CERTAIN CIVIL ACTIONS.— Except as provided in section 5(a)(1)(C), section 5(a)(2), clause (ii), (iii), or (iv) of section 5(a)(4)(A), section 5(b)(1)(A), or section 5(b)(3), in a civil action brought by a State attorney general, or an official or agency of a State, to recover monetary damages for a violation of this Act, the court shall not grant the relief sought unless the attorney general, official, or agency establishes that the defendant acted with actual knowledge, or knowledge fairly implied on the basis of objective circumstances, of the act or omission that constitutes the violation.

(g) ACTION BY PROVIDER OF INTERNET ACCESS SERVICE.—

    (1) ACTION AUTHORIZED.—A provider of Internet access service adversely affected by a violation of section 5(a)(1), 5(b), or 5(d), or a pattern or practice that violates paragraph (2), (3), (4), or (5) of section 5(a), may bring a civil action in

any district court of the United States with jurisdiction over the defendant—

    (A) to enjoin further violation by the defendant; or

    (B) to recover damages in an amount equal to the greater of—

        (i) actual monetary loss incurred by the provider of Internet access service as a result of such violation; or

        (ii) the amount determined under paragraph (3).

    (2) SPECIAL DEFINITION OF "PROCURE".—In any action brought under paragraph (1), this Act shall be applied as if the definition of the term "procure" in section 3(12) contained, after "behalf" the words "with actual knowledge, or by consciously avoiding knowing, whether such person is engaging, or will engage, in a pattern or practice that violates this Act".

    (3) STATUTORY DAMAGES.—

    (A) IN GENERAL.—For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the amount calculated by multiplying the number of violations (with each separately addressed unlawful message that is transmitted or attempted to be transmitted over the facilities of the provider of Internet access service, or that is transmitted or attempted to be transmitted to an electronic mail address obtained from the provider of Internet access service in violation of section 5(b)(1)(A)(i), treated as a separate violation) by—

        (i) up to $100, in the case of a violation of section 5(a)(1); or

        (ii) up to $25, in the case of any other violation of section 5.

    (B) LIMITATION.—For any violation of section 5 (other than section 5(a)(1)), the amount determined under subparagraph (A) may not exceed $1,000,000.

    (C) AGGRAVATED DAMAGES.—The court may increase a damage award to an amount equal to not more than three times the amount otherwise available under this paragraph if—

        (i) the court determines that the defendant committed the violation willfully and knowingly; or

        (ii) the defendant's unlawful activity included one or more of the aggravated violations set forth in section 5(b).

    (D) REDUCTION OF DAMAGES.—In assessing damages under subparagraph (A), the court may consider whether—

        (i) the defendant has established and implemented, with due care, commercially reasonable practices and procedures designed to effectively prevent such violations; or

        (ii) the violation occurred despite commercially reasonable efforts to maintain compliance with the practices and procedures to which reference is made in clause (i).

    (4) ATTORNEY FEES.—In any action brought pursuant to paragraph (1), the court may, in its discretion, require an undertaking for the payment of the costs of such action, and assess reasonable costs, including reasonable attorneys' fees, against any party.

15 USC 7707.

**SEC. 8. EFFECT ON OTHER LAWS.**

(a) FEDERAL LAW.—(1) Nothing in this Act shall be construed to impair the enforcement of section 223 or 231 of the Communications Act of 1934 (47 U.S.C. 223 or 231, respectively), chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, United States Code, or any other Federal criminal statute.

(2) Nothing in this Act shall be construed to affect in any way the Commission's authority to bring enforcement actions under FTC Act for materially false or deceptive representations or unfair practices in commercial electronic mail messages.

(b) STATE LAW.—

(1) IN GENERAL.—This Act supersedes any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto.

(2) STATE LAW NOT SPECIFIC TO ELECTRONIC MAIL.—This Act shall not be construed to preempt the applicability of—

(A) State laws that are not specific to electronic mail, including State trespass, contract, or tort law; or

(B) other State laws to the extent that those laws relate to acts of fraud or computer crime.

(c) NO EFFECT ON POLICIES OF PROVIDERS OF INTERNET ACCESS SERVICE.—Nothing in this Act shall be construed to have any effect on the lawfulness or unlawfulness, under any other provision of law, of the adoption, implementation, or enforcement by a provider of Internet access service of a policy of declining to transmit, route, relay, handle, or store certain types of electronic mail messages.

15 USC 7708.

Deadline.
Reports.

**SEC. 9. DO-NOT-E-MAIL REGISTRY.**

(a) IN GENERAL.—Not later than 6 months after the date of enactment of this Act, the Commission shall transmit to the Senate Committee on Commerce, Science, and Transportation and the House of Representatives Committee on Energy and Commerce a report that—

(1) sets forth a plan and timetable for establishing a nationwide marketing Do-Not-E-Mail registry;

(2) includes an explanation of any practical, technical, security, privacy, enforceability, or other concerns that the Commission has regarding such a registry; and

(3) includes an explanation of how the registry would be applied with respect to children with e-mail accounts.

(b) AUTHORIZATION TO IMPLEMENT.—The Commission may establish and implement the plan, but not earlier than 9 months after the date of enactment of this Act.

15 USC 7709.

Deadline.
Reports.

**SEC. 10. STUDY OF EFFECTS OF COMMERCIAL ELECTRONIC MAIL.**

(a) IN GENERAL.—Not later than 24 months after the date of the enactment of this Act, the Commission, in consultation with the Department of Justice and other appropriate agencies, shall submit a report to the Congress that provides a detailed analysis of the effectiveness and enforcement of the provisions of this Act and the need (if any) for the Congress to modify such provisions.

PUBLIC LAW 108–187—DEC. 16, 2003         117 STAT. 2717

(b) REQUIRED ANALYSIS.—The Commission shall include in the report required by subsection (a)—

(1) an analysis of the extent to which technological and marketplace developments, including changes in the nature of the devices through which consumers access their electronic mail messages, may affect the practicality and effectiveness of the provisions of this Act;

(2) analysis and recommendations concerning how to address commercial electronic mail that originates in or is transmitted through or to facilities or computers in other nations, including initiatives or policy positions that the Federal Government could pursue through international negotiations, fora, organizations, or institutions; and

(3) analysis and recommendations concerning options for protecting consumers, including children, from the receipt and viewing of commercial electronic mail that is obscene or pornographic.

**SEC. 11. IMPROVING ENFORCEMENT BY PROVIDING REWARDS FOR INFORMATION ABOUT VIOLATIONS; LABELING.**

Reports.
Deadlines.
Procedures.
15 USC 7710.

The Commission shall transmit to the Senate Committee on Commerce, Science, and Transportation and the House of Representatives Committee on Energy and Commerce—

(1) a report, within 9 months after the date of enactment of this Act, that sets forth a system for rewarding those who supply information about violations of this Act, including—

(A) procedures for the Commission to grant a reward of not less than 20 percent of the total civil penalty collected for a violation of this Act to the first person that—

(i) identifies the person in violation of this Act; and

(ii) supplies information that leads to the successful collection of a civil penalty by the Commission; and

(B) procedures to minimize the burden of submitting a complaint to the Commission concerning violations of this Act, including procedures to allow the electronic submission of complaints to the Commission; and

(2) a report, within 18 months after the date of enactment of this Act, that sets forth a plan for requiring commercial electronic mail to be identifiable from its subject line, by means of compliance with Internet Engineering Task Force Standards, the use of the characters "ADV" in the subject line, or other comparable identifier, or an explanation of any concerns the Commission has that cause the Commission to recommend against the plan.

**SEC. 12. RESTRICTIONS ON OTHER TRANSMISSIONS.**

Section 227(b)(1) of the Communications Act of 1934 (47 U.S.C. 227(b)(1)) is amended, in the matter preceding subparagraph (A), by inserting ", or any person outside the United States if the recipient is within the United States" after "United States".

**SEC. 13. REGULATIONS.**

15 USC 7711.

(a) IN GENERAL.—The Commission may issue regulations to implement the provisions of this Act (not including the amendments made by sections 4 and 12). Any such regulations shall be issued in accordance with section 553 of title 5, United States Code.

117 STAT. 2718        PUBLIC LAW 108–187—DEC. 16, 2003

        (b) LIMITATION.—Subsection (a) may not be construed to
authorize the Commission to establish a requirement pursuant
to section 5(a)(5)(A) to include any specific words, characters, marks,
or labels in a commercial electronic mail message, or to include
the identification required by section 5(a)(5)(A) in any particular
part of such a mail message (such as the subject line or body).

15 USC 7712.        **SEC. 14. APPLICATION TO WIRELESS.**

        (a) EFFECT ON OTHER LAW.—Nothing in this Act shall be inter-
preted to preclude or override the applicability of section 227 of
the Communications Act of 1934 (47 U.S.C. 227) or the rules pre-
scribed under section 3 of the Telemarketing and Consumer Fraud
and Abuse Prevention Act (15 U.S.C. 6102).

Deadline.        (b) FCC RULEMAKING.—The Federal Communications Commis-
sion, in consultation with the Federal Trade Commission, shall
promulgate rules within 270 days to protect consumers from
unwanted mobile service commercial messages. The Federal
Communications Commission, in promulgating the rules, shall, to
the extent consistent with subsection (c)—
        (1) provide subscribers to commercial mobile services the
    ability to avoid receiving mobile service commercial messages
    unless the subscriber has provided express prior authorization
    to the sender, except as provided in paragraph (3);
        (2) allow recipients of mobile service commercial messages
    to indicate electronically a desire not to receive future mobile
    service commercial messages from the sender;
        (3) take into consideration, in determining whether to sub-
    ject providers of commercial mobile services to paragraph (1),
    the relationship that exists between providers of such services
    and their subscribers, but if the Commission determines that
    such providers should not be subject to paragraph (1), the
    rules shall require such providers, in addition to complying
    with the other provisions of this Act, to allow subscribers to
    indicate a desire not to receive future mobile service commercial
    messages from the provider—
            (A) at the time of subscribing to such service; and
            (B) in any billing mechanism; and
        (4) determine how a sender of mobile service commercial
    messages may comply with the provisions of this Act, consid-
    ering the unique technical aspects, including the functional
    and character limitations, of devices that receive such messages.
        (c) OTHER FACTORS CONSIDERED.—The Federal Communica-
tions Commission shall consider the ability of a sender of a commer-
cial electronic mail message to reasonably determine that the mes-
sage is a mobile service commercial message.
        (d) MOBILE SERVICE COMMERCIAL MESSAGE DEFINED.—In this
section, the term "mobile service commercial message" means a
commercial electronic mail message that is transmitted directly
to a wireless device that is utilized by a subscriber of commercial
mobile service (as such term is defined in section 332(d) of the
Communications Act of 1934 (47 U.S.C. 332(d))) in connection with
such service.

15 USC 7713.        **SEC. 15. SEPARABILITY.**

        If any provision of this Act or the application thereof to any
person or circumstance is held invalid, the remainder of this Act
and the application of such provision to other persons or cir-
cumstances shall not be affected.

PUBLIC LAW 108–187—DEC. 16, 2003        117 STAT. 2719

**SEC. 16. EFFECTIVE DATE.**

The provisions of this Act, other than section 9, shall take effect on January 1, 2004.

Approved December 16, 2003.

15 USC 7701 note.

LEGISLATIVE HISTORY—S. 877:

SENATE REPORTS: No. 108–102 (Comm. on Commerce, Science, and Transportation).
CONGRESSIONAL RECORD, Vol. 149 (2003):
    Oct. 22, considered and passed Senate.
    Nov. 21, considered and passed House, amended.
    Nov. 25, Senate concurred in House amendment with an amendment.
    Dec. 8, House concurred in Senate amendment.

○